1  Calvin Fan                                    ORIGINAL
2  4564 Pescadero Avenue
3  San Diego, California 92107                   ~~COPY~~
4  (619) 846-1492
5  FindMeInkTrustee@gmail.com
6
7
8              UNITED STATES DISTRICT COURT
9            SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11 **TRUSTEE OF THE** | Case No. __'18CV0982 BTM JLB__ |
| 12 **FIND ME INK TRUST** and | |
| 13 CALVIN FAN, trustee and individually | **Complaint** |
| 14 Plaintiffs, | Demand for Jury Trial |
| 15 v. | |
| 16 RICHARD **HECKER**, | Violation of Securities Exchange Act |
| 17 TRACTION & SCALE LLC, | of 1934 (unregistered broker, |
| 18 HECKER CONSULTANCY, LLC, | securities fraud); Fraudulent |
| 19 and DOES 1–10, | Inducement; Unjust Enrichment; |
| 20 Defendants | Interference with Prospective |
| 21 | Economic Advantage; Breach of |
| 22 | Fiduciary Duties; Breach of |
| 23 | Nondisclosure Agreements; Civil |
| 24 | Conspiracy; Aiding & Abetting; |
| 25 | Declaratory Judgment of Alter Ego |
| 26 | |

27
28
Complaint                     1                        18cv_____

I.   Introduction ................................................................................. 5

II.  Parties ........................................................................................... 5

III. Jurisdiction and Venue ................................................................ 7

    A.  Subject Matter Jurisdiction ................................................... 7

    B.  Personal Jurisdiction ............................................................. 8

    C.  Venue .................................................................................... 11

IV. Factual Background .................................................................... 12

    A.  Richie Hecker, serial entrepreneur ...................................... 12

    B.  Defendant Richie Hecker approaches M&P under the direction of Doe 1 at
        NY Techweek ........................................................................ 16

    C.  Defendant Richie Hecker arranges a $10,000 kickback from the
        Development Agreement ....................................................... 23

    D.  TTI terminates the Development Agreement, thwarting the kickback to
        Defendant Richie Hecker ...................................................... 27

    E.  Defendant Richie Hecker admits the $10,000 kickback arrangement ....... 29

    F.  Review of Formation of Tattoo Technologies, Inc. (TTI) and Merger with
        M&P ...................................................................................... 32

    G.  Defendant Richie Hecker sells securities as an unregistered Broker ........ 33

    H.  Defendant Richie Hecker interferes with crowdfunding campaign and
        conducts secret negotiations to sell TTI .............................. 36

    I.  TTI terminates Defendant Richard Hecker as Chairman and Director for
        cause ..................................................................................... 40

    J.  Demand that the TTI Board take action against Defendant Richie Hecker 41

Count 1: Violation of federal Securities Exchange Act of 1934 (against Defendant Hecker) .......................................................................... 43

Count 2: Violation of federal SEC Rule 10b-5 (against Defendants Hecker and Traction & Scale LLC) .......................................................... 46

Count 3: Fraudulent Inducement of Merger (Delaware common law) (against Defendants Hecker and Traction & Scale LLC) ................................ 50

Count 4: Fraudulent Inducement of Merger (New York common law) (against Defendants Hecker and Traction & Scale LLC) ................................ 53

Count 5: Unjust Enrichment (Delaware common law) (against Defendant Hecker) .......................................................................................... 55

Count 6: Interference with Prospective Economic Advantage (New York common law) (against Defendants Hecker, Traction & Scale LLC, Does 1–10). 56

Count 7: Breach of Fiduciary Duties (Delaware common law) (Plaintiff Trustee of the Find Me Ink Trust against Defendant Hecker) ................................ 58

    A.   $10,000 kickback arrangement for Defendant Hecker's personal gain .......................................................................................... 58

    B.   Crowdfunding Drama ......................................................... 59

    C.   Richie's secret negotiations with competitors to sell TTI ................ 60

    D.   Termination Drama ............................................................ 61

    E.   Remedy .......................................................................... 62

Count 8: Inducing Breach of Fiduciary Duties (Delaware common law) (Plaintiff Trustee of the Find Me Ink Trust against Defendant Does 1–3 & 5) .... 63

Count 9: Breach of Intellectual Property Assignment Agreement (Delaware common law) (against Defendant Hecker) ............................................. 65

Count 10: Inducing Breach of Intellectual Property Assignment Agreement (Delaware common law) (against Defendant Does 1–3) ...................... 67

Count 11: Breach of Reciprocal Nondisclosure Agreement (New York common law) (against Defendant Traction & Scale LLC and Hecker)............... 69

Count 12: Inducing Breach of Reciprocal Nondisclosure Agreement (New York common law) (against Defendant Does 1–3)........................................ 71

Count 13: Civil Conspiracy (New York common law) (against all Defendants)... 73

Count 14: Aiding and Abetting (New York common law) (against all Defendants) ................................................................................................... 75

Count 15: Request for Declaratory Judgment of Alter Ego (Delaware common law) (Defendants Traction & Scale LLC and Hecker).................................. 77

Count 16: Request for Declaratory Judgment of Alter Ego (New York common law) (against Defendants Hecker Consultancy, LLC and Hecker)........ 80

V.  Prayer for Relief........................................................................................ 82

VI.  Jury Demand............................................................................................. 83

# I.  Introduction

1.     Plaintiffs, Trustee of the Find Me Ink Trust, Calvin Fan trustee ("FMI Trust") and Calvin Fan individually ("Calvin"), derivatively on behalf of Tattoo Technologies, Inc. ("TTI") and its shareholders, complain against Defendants Richard Hecker ("Richie"), Traction & Scale LLC ("T&S"), Hecker Consultancy, LLC ("HC"), and Does 1–10, and allege on information and belief as follows:

# II.  Parties

2.     The Find Me Ink Trust is an express, living revocable trust that is the owner of about 260,042 shares of common stock in Tattoo Technologies, Inc. (TTI). Plaintiff Trustee of the Find Me Ink Trust, Calvin Fan trustee, is a resident of San Diego, California.  Pursuant to F.R.C.P. 17(1)(E), this action is being prosecuted in the name of the trustee of an express trust.

3.     Plaintiff Calvin Fan, as an individual, is a resident of San Diego, California.

4.     Plaintiffs Trustee of the Find Me Ink Trust and Calvin Fan are referred to herein as the "**Plaintiffs**".

5.     Defendant **Richard Hecker** is a resident of New York City, New York, and a self-described serial entrepreneur, investor, and executive.  Defendant Hecker is often referred to herein as "**Richie**" as he is universally known by co-workers, entrepreneurs and investors from all walks of life.

6.     Defendant **Traction & Scale LLC** (T&S), is a Delaware limited liability company (file number 49**666**42) having a principal place of business at his father's dental office on 2160 81st Street, Brooklyn, New York 11214.  Defendant Hecker founded T&S in 2011 as "a private equity firm specializing in incubating digital media and direct marketing companies and turn-around situations, and [he] serves

as its Managing Member."[1]  Richie owns[2] T&S and serves as its Chairman and "Chief Catalyst".  On information and belief, Traction & Scale LLC is an alter ego of Defendant Richie.

7.     Defendant **Hecker Consultancy, LLC**, is a New York limited liability company (DOS ID 3081162) created on July 21, 2004, also having a mailing address at 2160 81st Street, Brooklyn, New York 11214.  "I, Richard Hecker, am the 100% owner of Hecker Consultancy."  Decl. Hecker Supp. Mot. Appoint. Receiver for Bebo, Inc. (Jan. 1, 2013), Exh. 1 ¶ 1 [TTI internal ref. wA01].  On information and belief, Hecker Consultancy, LLC is an alter ego of Defendant Richie.

8.     Defendants Richard Hecker, Traction & Scale LLC, and Hecker Consultancy, LLC are referred to herein collectively as the "**Named Defendants**".

9.     Defendant Doe 1 is a resident of New York City and citizen of New York state.  He is a Managing Partner of Defendant Doe 3, and, on information and belief, is an employee of Defendant Doe 4.

10.    Defendant Doe 2 has principal places of business in New York and Hong Kong.  On information and belief, Defendant Doe 2 is a subsidiary of and is controlled by Defendant Doe 3.

11.    Defendant Doe 3 is a British Virgin Islands limited liability company that invests in Technology, Media, and Telecom.

12.    Defendant Doe 4 is an employee of SI Securities, LLC, and an executive and co-founder of Crypto Working Group, LLC.  On information and belief, Defendant

---

[1] Ascend Acquisition Corp. Form 10-K of Dec. 31, 2012, Exh. 2 at 35–36 [wA20] Available at https://www.sec.gov/Archives/edgar/data/1350773/000114420413020859/v340385_10k.htm

[2] Richie described Traction & Scale LLC "as an entity which is owned by me." Call of April 5, 2016.  Despite complaints by TTI directors, Richie used his Traction & Scale email address (richie@tractionandscale.com) for fundraising emails on behalf of TTI and for personal emails, so it was often unclear on whose behalf Richie was contacting potential investors and vendors.

Doe 1 resides near New York City and is a German citizen *per jus sanguinis et jus solo*.

13.     Defendant Doe 5 was an organizer of New York Techweek in 2015.

## III.  Jurisdiction and Venue

**A.     Subject Matter Jurisdiction**

### 1.     Federal Question

14.     Pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction because this action arises under the federal Securities Exchange Act of 1934 (codified at 15 U.S.C. § 78a *et seq.*).  15 U.S.C. § 78aa (district courts "shall have exclusive jurisdiction").

15.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the Plaintiffs' state law claims, which arise from a common set of facts, occurrences, and circumstances.

### 2.     Diversity of Citizenship

16.     This Court also has subject matter jurisdiction because Plaintiff FMI Trust is a living revocable trust created under the laws of the state of California.  Plaintiff Fan, as trustee and individually, is a citizen of California.  Defendant Hecker is a citizen of the state of New York.  Defendants Traction & Scale LLC and Hecker Consultancy LLC are limited liability companies under the laws of Delaware and New York, and both have principal places of business in New York.  The matter in controversy exceeds $75,000.  28 U.S.C. § 1332(a).

**B.     Personal Jurisdiction**

17.     This Court has personal jurisdiction over the Named Defendants as follows:

**1.     Defendant Hecker**

**a.     *Specific jurisdiction over Hecker***

18.     This Court has specific personal jurisdiction over Defendant Hecker.  Over 2016–2017, Richie had continuous and systematic contacts with California by contacting numerous potential investors in California to offering securities in TTI.[3]

19.     For example, around August to October 2016, as Chairman of TTI Defendant Hecker contacted Sam Humphreys at London Bay Capital in San Francisco California to sell TTI securities.  Richie had invested with Sam in Propel Media, headquartered in Irvine, California.  On October 26, 2016, Richie contacted Mike Jones in Los Angeles to offer a $25,000 investment.  Around November 2, 2016, Richie contacted Michael Birch and Will Bunker, both in California, about investing in TTI.  These contacts gave rise to at least the Violation of the Securities Exchange Act of 1934.[4]

20.     On information and belief, while Chairman of TTI, Defendant Hecker contacted Bunker Hill Capital in San Diego, California, and Nexus Brands Group

[3] *See* FMI Investor Pipeline 10.20.2016, updated Feb. 17, 2017.  [wE13]. California investors contacted by Richie include: Mike Jones, Sam Humphreys with London Bay Capital, Michael Birch, SV Angel, David Lee, Max Levchin, Dinesh Moorjani, C. Jackson at SFGAA, Will Bunker, Jeff at Right Side Capital, Cyan Bannister.

[4] "Thus, a single tortious e-mail message to a forum state resident (like a letter or telephone call) may support the exercise of specific jurisdiction over the nonresident sender."  FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 3:301 (Rutter Group 2017) (citing *Internet DOOIWBY, Inc. v. Parks,* 138 F. Supp. 2d 773, 774 (S.D. Miss. 2001); *see also Verizon Online Services, Inc. v. Ra/sky*, 203 F.Supp.2d 601, 610 (E.D.Va. 2002).

in Anaheim, California to secretly negotiate a sale of TTI, which gave rise to the Breach of Fiduciary Duties (as director) and Breach of the Reciprocal Nondisclosure Agreement.

### b.    General jurisdiction over Hecker

21.    This Court also has general personal jurisdiction over Defendant Hecker, who has long sought and made investments in California.  He has also assumed executive positions in companies having a principal place of business in California.

22.    Since June 6, 2014, Defendant Hecker has been Chairman of Get Lifing Inc. (file number 5547215) dba Hinter.co, a Delaware corporation having a principal place of business in Santa Monica, California.  Exhs. 12 [wA08] & 21 [wA03].

23.    Since 2014, Defendant Hecker was an operating partner in More Cowbell, LLC, a California company dba Mojiva (II).  *See* Mojiva Blog of Jan. 23, 2015 at 1, Exh. 3 [wA15].

24.    In the Form 10-K annual report filed in 2012 by Ascend Acquisition Corp, which had a principal place of business in San Francisco, California.  Richie's address was listed as 360 Ritch Street, Floor 3, San Francisco, California.

25.    On May 9, 2011, Defendant Richie appeared in San Francisco to present on behalf of his company Stockton Equity LLC.  Exh. 4 [wA39].

26.    From June 2010 to December 2011, Defendant Richie was an Operator and a member of the board of directors of Buckaroo Acquisition Corp. (Bebo),[5] having a principal place of business in Los Angeles, California.  Defendant Hecker was Chief Experience Officer of Bebo from June 2010 to March 2011 and listed his address as 425 Bush Street, San Francisco.  Around this time, Defendant Hecker Consultancy, LLC became a 15% owner.

---

[5] Decl. Hecker Supp. Mot. Appointment of Receiver for Bebo, Inc. (Jan. 1, 2013), Exh. 1 [wA01] para. 3.

27.     Around January 2011, Defendant Hecker became a Director of Andover Games, having a principal place of business in San Francisco, California.

### 2.     Traction & Scale LLC

28.     On information and belief, this Court has derivative personal jurisdiction over Defendant Traction & Scale LLC because it is an alter ego of Defendant Hecker, who operated as "Chairman & Chief Executive Officer" of Traction & Scale using the email address richie@tracetionandscale.com and T&S signature block for virtually all his email communications.

29.     This Court has specific personal jurisdiction over Traction & Scale because the acts and omissions giving rise to causes of action in this Complaint were performed by under the name of Traction & Scale using the T&S email domain. For example, T&S email was used for the tortious email of August 19, 2016, and each of the numerous emails seeking investment from California residents.

30.     This Court also has general personal jurisdiction over Defendant Traction & Scale LLC as a holding company that owns or controls portfolio companies located in California, such as Get Lifing Inc., which has a principal place of business in Santa Monica, California, and Unreel.me, a company having a principal place of business in Santa Monica, California.  In 2012, Defendant T&S also contracted with Kitara, based in San Francisco, California.

### 3.     Hecker Consulting LLC

31.     On information and belief, Defendant Hecker Consulting LLC is an alter ego and *simply functioned as a façade* for the 100% owner, Defendant Hecker.  This Court therefore has derivative personal jurisdiction over Defendant Hecker Consulting LLC.

32.     In addition, Defendant Hecker Consulting LLC purposefully availed itself of the judicial resources of the State of California by filing a lawsuit on March 5, 2012.  *MXB Holdings, LP v. Adam Levin*, San Francisco County Sup. Ct. Case CGC-12-518820.  Hecker Consulting LLC also owned 14.92% of Bebo, Inc.[6] a company having a principal place of business in Burlingame and Los Angeles, California, and later filing for bankruptcy in 2013 in the Central District Court of California.

## C.     Venue

33.     Venue in this case is proper because the Named Defendants reside or are limited liability companies of different judicial districts, and the Plaintiffs and Named Defendants are subject to this Court's personal jurisdiction.  28 U.S.C. § 1391(b)(3).  Defendant Hecker's key omission from disclosing the $10,000 kickback arrangement, giving rise to the federal 10b-1 violations and the fraudulent inducement claims occurred during the multiparty call on August 19, 2016 during which one of the participants was physically present in the Southern District of California.  *Id.* § 1391(b)(2); *see First of Mich. Corp. v. Bramlet* 141 F.3d 260, 263 (6th Cir. 1998).  Section 1391(b)(2) does not require that a majority of the "events or omissions" occur in the district where suit is filed; nor that the events there predominate.  It is sufficient that a "substantial part" occur there.  *See Jenkins Brick Co. v. Bremer,* 321 F.3d 1366, 1371 (11th Cir. 2003); *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005); *Pecoraro v. Sky Ranch for Boys, Inc.* 340 F.3d 558, 563 (8th Cir. 2003) ("we do not ask which district among two . . . potential forums is the 'best' venue").

---

[6] Decl. of Richard Hecker in Supp. Mot. Appointment of Receiver for Bebo, Inc. (Jan. 1, 2013) para. 1.

34.     In shareholder derivative suits on behalf of a corporation, the action may be maintained in any district where the corporation could have sued the same defendants.  29 U.S.C. § 1401.

35.     Defendant Doe 2 is a Hong Kong entity and not resident in the United States and may be sued in any judicial district.  *Id.* § 1391(c)(3).

## IV.  Factual Background

**A.  Richie Hecker, serial entrepreneur**

36.     From an early age, Defendant Richie Hecker sought attention.[7]  By his own account, he was almost too busy to attend class in his Brooklyn high school, and spent college "sitting at his desk in his bathrobe with a glass of Glenlivet 18 Scotch in one hand and a laptop in the other hand with a phone glued to his ear.  I basically didn't go to class.[8]  I did everything I could to get extra credit for things and worked the system as best as possible."  Exh. 5 [wA02].

37.     According to a typical bio, from the website for Safeguard Guaranty, a company that insures against the expenses of divorce, Exh. 6 [wA25]:

> Mr. Hecker has been a serial entrepreneur since age 15 when he started his first business, Review Master, aggregating and selling test notes and reviews for exams & NYS regents.  He then went on to found a successful stock analysis website while still a teenager.  This led him to merge his site with that of another

---

[7] *See* Exh. 7 [wA10]
https://web.archive.org/web/20060414165644/http://www.richiehecker.com:80/
(Flash required for full effect)

[8] This helps to explain his daily struggles with spelling and reading comprehension.  Richie practiced reading his emails aloud before sending them.  Richie also agreed that underlining questions for him helps him identify certain text as questions so he can answer them.  Over time, he has been assisted by a host of ghost writers and co-authors for articles.

young entrepreneur and the two partners then developed a multi-million dollar interactive ad agency and email house, ClickZen Worldwide in 2000.  In 2003, Mr. Hecker created a separate lead generation division, ZenFinancial, a large call center outsourcing firm specializing in outbound telemarketing of financial services.  ZenFinancial was spun off into a separate company that he led for 2 years and then sold in 2005. Since then, he has founded, invested in and/or acquired over a dozen companies.

38.     In one venture while in college, he copied and distributed a video trailer created by Peggy Spolar, who was in the process of registering the copyright. Rather than wait, Richie badgered her agent: "I'm telling you to give me a copy.  I'm the executive producer.  ***Trust me.***"  So her agent gave Richie a copy, and he sent it without permission to his family and friends, who disseminated the video further.  Ms. Spolar sued Richie for copyright infringement.  *See Spolar v. Hecker*, 3:06-cf-00810 (N.D.N.Y.) filed June 29, 2006, Exh. 8 [wA21].  After a hearing, Richie's father wrote Ms. Spolar a $150,000 check for the full statutory damages.  Her assessment of Richie at the time was that he was a smart kid but "He doesn't listen.  He gets ahead of himself."  Those words still ring true today.

39.     Social media platform **Bebo**, Inc. was founded by Michael Birch and his wife Xochi in 2005.  In 2008, Bebo was bought by AOL for $850 million in cash, "a deal widely regarded even at the time as significantly overpriced."  In June 2010, an investment consortium (Criterion Capital Partners) bought Bebo's assets for between $2.5 and $10 million.[9]  Around this time, Richie became a director of Bebo and took the title CXO ("Chief Experience Officer").[10]  "I used to manage

---

[9] "Most recently [Richie] led the acquisition of Bebo, once the #3 social network from AOL and turned it profitable within six months."  Exh. 9 [wA29].

[10] It is unclear what role Richie played as CXO, but he says "In a past life, he ran one of the largest social networks in the world".  Exh. 10 [wA27].  He was also described to the SEC as more of a "consultant" for Bebo, Exh. 2 at 4 [wA20].

people by screaming at people, but I've changed.  Sometimes I think I'm too nice."[11]  Nine months later, Richie stepped down as CXO but remained a director.  Bebo was mismanaged into bankruptcy and was eventually bought back by founder Michael Birch for $1 million.

40.     Richie said he co-founded **inSparq** in April 2011, taking the title of Chairman.  Defendant Doe 1 was an investor, perhaps in connection with $1,006,000 raised in a Convertible Note.  In 2011–2012 he fell into a deep funk at inSparq, and someone senior took him aside and told him people were relying on him, but "You're walking around like you're carrying a box of tissues."[12]  He managed to snap out of the depression. Since working with TTI, he has again experienced high anxiety, and the screaming and tears returned.)  Richie parted ways with InSparq under "the strongest NDA I've ever signed,"[13] although he continued to circulate inSparq's employee vesting plan as a MS Word template for future companies.

41.     Around January 2011, Richie became a director of **Andover Games**, and Richie tells people that he turned, "an insolvent, non revenue producing company into a public company with $89MM+ in revenue and over 10X returns for seed investors."  According to his web page, Richie was "Moving seamlessly in bootstrap and boardroom environments with an expertise in corporate finance, product strategy and marketing."  Around January 2012, Andover Games was bought by Ascend Acquisition Corp, providing Andover Games with $250,000 in bridge financing.  Also in February 2012, in connection with the closing of the merger with Ascend, the Company entered into a consulting agreement with

*But see* Exh. 11 [wA22] at 8 ("Instead, we're probably going to wind up with Julia Roy, Richie 'I bought Bebo' Hecker")
[11] Call of Oct. 31, 2016.
[12] *Id.*
[13] Call of March 15, 2016.

Defendant Traction and Scale LLC, an affiliate of Richard Hecker's, the Company's then Executive Vice President.  "Each consulting agreement is for two years and provides for the individuals to be paid an annual consulting fee of $150,000 each, respectively."  Exh. 13 [wA34].  By July 2013, Ascend Acquisition merged with Kitara, conditioned on Richie's resignation from the board.  Item 5.02 of Ascend Acquisition Corp. Form 8-K of July 1, 2013, Exh. 14 [wA35].

42.     Richie joined the board of **Mojiva**, where he claimed to M&P he raised $50 million, although according to Miles Spencer's blog, it was Miles who had "Raised seed, angel, and four rounds of venture capital totaling about $50,000,000".  "The acquisition price was $15.5 million dollars. . . .  This marks a disappointing end for the company, which raised over $45 million dollars." "Pubmatic Acquires Mobile Ad Server Mocean Mobile", *AdAge*, (May 19, 2014) Exh. 15 [wA28].

43.     On May 27, 2016, Richie achieved nearly five hours of internet fame by offering then-candidate Donald Trump a $10 million donation for the opportunity to host a Trump-Sanders debate.[14]  The publicity stunt was widely ridiculed before Trump withdrew the debate offer.  Exh. 17 [wA30].

44.     On May 4, 2017, Richie "co-wrote" an article proposing a nonpartisan alternative to Obamacare for President Trump: *TrumpCares*.[15]  Exh. 18 [wA17].

---

[14] https://www.buzzfeed.com/chrisgeidner/tech-company-we-will-put-u…0-million-for-bernie-trump-deba?utm_term=.cwE2Px5EgZ#.ydozmpwdMg.  Exh. 16 [wA14].  "Asked whether they had contacted either the Trump or Sanders campaigns, Hecker said no." http://www.politicususa.com/2016/05/27/tech-company-calls-trumps-bluff-offering-put-10-million-sanders-debate.html.  Richie remains pleased with his $10M publicity stunt, saying on October 31, 2016, that it got him "a lot of attention at cocktail parties."

[15] Bringing insights like "If more people suffer or die from treatable illnesses, the health care system of a country is a failed one.  If more people live better, healthier lives, then the healthcare system is successful."  "Mandate that any meal paid for directly or indirectly by the government be fresh food. This includes school and hospital lunches. If the government is giving away a meal, it should be

45.    Considered as a whole, Richie's career strategy has been to approach young entrepreneurs with big talk of his 17+ years as a seasoned technology[16] entrepreneur and fundraiser.  He formed companies where the size of his stake was obscured until too late in the game.  The companies were then required to work with Richie's stable of friends and associates as tech and legal providers, because they were the "only ones I trust."  In the name of "unanimous consent" he effectively became a veto-holding member who could block any forward action[17] until the company agreed to a sufficient payout to make him leave.  He generally prefers title of Chairman, although he has recently adopted the title of Chief Economist ("finance geek and self-taught economist") for Crypto Working Group. LinkedIn profile of Richie Hecker (May 12, 2018) Exh. 19 [wA31].

**B.  Defendant Richie Hecker approaches M&P under the direction of Doe 1 at NY Techweek**

46.    On August 5, 2015, three friends in their mid-20s, Mark Mahoney, Jordan McKim, and Corey Milella, founded **Find Me Ink**, a Chicago-based website for customers to search for and book appointments with tattoo artists.  The company, using the business name Mahoney & Partners Financial Services, Inc. ("**M&P**")

---

good for the person—especially children, the elderly and the ill.  . . . Ask: Will this be better for the person effected than the current plan? This will result in the best plan for the American people, regardless of political orientation."

[16] At one meeting in Chicago, M&P observed that Richie did not know how to use Spell Check on MS Word, or how to Zoom in MS Excel to magnify the view of the spreadsheet.  After dinner at Fado Irish Pub (What's ketchup?), he hailed a taxi to get back to the Marriott, which was in sight four blocks away.  He had seen the Google Maps app on his phone but had never used it and did not know what it did or how it could help him find his location.

[17] Ascend Acquisition was unable to file its 10q for May 6, 2013 on time.

was an Illinois C-corporation.  Around October 15, 2015, M&P attended the startup promotion event Techweek in New York.

47.     On information and belief, one of the organizers of Techweek alerted his friend Richie to the participation of a tattoo website company, and Richie asked his friend Defendant Doe 5, to "red flag" M&P from reaching the final competition, effectively sequestering M&P from investors at Techweek.  This would allow Richie to approach M&P in hopes of locking up an exclusive deal with M&P.

48.     In the closing days of Techweek, Richie arranged a meeting with M&P and presented himself[18] as an entrepreneur with a proven track record as a fundraiser (recently raising $50M for Mojiva and a success with Andover Games and SpikeTV) and access to top technical talent through his incubator Traction & Scale LLC ("**T&S**"). [19]  Exh. 20 [wA32].  Richie said he had been looking for the right play in the tattoo industry, and had investors lined up for $0.5–1.5 million, promising a formal offer by November 3, 2015.

49.     Richie's interest cooled for a while, but picked up in 2016.  On March 3, 2016 and onward, Richie represented that the round would be led by his family friend and mentor, Defendant Doe 1, who had invested in one of Richie's earlier

---

[18] "Entrepreneur and company turnaround magician" Exh 21 [wA29].

[19] In addition, Richie represented that his company Traction & Scale LLC, with its deep pool of expertise and his portfolio companies on its website, could provide training and incubate the growth of an early startup like M&P.  "Traction & Scale likes to be a nurturing incubator that will either be a partner or CEO or manager" with M&P, and T&S will bring its talent (finance, marketing, fundraising, IT) as a co-founder.  Call of March 17, 2016.  In reality, the T&S talent pool portrayed on the site had dispersed, his portfolio companies had failed or were struggling, and the whole of Traction & Scale was in actuality only Richie.  When asked why his T&S site listed numerous people who no longer had any connection with T&S, Richie said the site hadn't been updated in a while."  Richie's habit of borrowing feathers continues on the site of his Crypto Working Group.  *Cf.* Exh. 22 [wE02] *with* https://www.cryptoworkinggroup.com/team/.

companies.[20]  They had considered another tattoo website and passed, but Richie persuaded Doe 1 that M&P would be the right fit for their plans.

50.     Richie was coy about sharing details about Defendant Doe 1, and delayed proposing concrete deal terms until he could confirm them with Defendant Doe 1.[21]  Around March 14–17, 2016 and after, Richie assured TTI repeatedly that Defendant Doe 1 would invest $1.5 million dollars in 30 days, or least $250,000 in 20 days, with the rest to follow as Defendant Doe 1 led the round with four other investors.

51.     From about March 18, 2016 onward, M&P and Richie, acting as Managing Member of Traction & Scale LLC, exchanged numerous draft term sheets, negotiating the structure of the entity to become Tattoo Technologies, Inc. (TTI).

52.     Richie (acting through Traction & Scale LLP) signed a Reciprocal Nondisclosure Agreement (RNA) on April 10, 2016, which included a 2-year noncircumvention provision for certain investors Richie already had in mind.  Exh. 29 [wG04].

53.     M&P and Richie agreed to basic terms in a "Letter of Intent for NewCo LLC" effective April 25, 2016, Exh. 23 [wC18].  Richie insisted on an LLC structure to avoid corporate income tax, and jarringly because "it's nearly

---

[20] Richie's email of March 2, 2016: "Investor is a family office fund manager that manages money for a leading executive in the fashion business. It's an old friend, they would be as involved as we ask. They helped come up with the idea for what we've been doing and helped with roadmapping so far. Active board member."

[21] On March 17, 2016, Richie said "I have a very specific process for how to do this. That's the way I want to do it.  I want consistency because . . . I've only been dealing with [Defendant Doe 1] so far.  I'll bring up structure [of the TTI's organization, ownership and control] when the time is right."  "[Defendant Doe 1] doesn't do things like a typical VC - more like family."  In the past, Doe 1 had written Richie checks for $15,000 to $2M.  Call of May 16, 2016.

1    impossible to fire a member" of an LLC.[22]  Richie was later persuaded by counsel

2    that investors preferred to invest in a C-corporation structure.

3    54.     On July 11, 2016, T&S engaged Foley & Lardner LLP ("Foley") to form

4    Tattoo Technologies, Inc.  Foley had sent a form questionnaire to Richie to

5    complete with the desired structure of the company.  Richie did not read many of

6    the questions, and answered many of them incompletely.  In a tearful call on July

7    14, 2016, Richie explained that he had gone through a period in his life where he

8    struggled with doing things too fast, but he thought he had worked on it.  When he

9    was at inSparq, he had rushed some corporate documents, and it was very

10   expensive to fix, although at the time he played it off as a bargain for the company.

11   Richie apologized to M&P for working too fast on the Foley questionnaires and

12   admitted he "f✳cked it up."  Richie made seven attempts to answer the

13   questionnaire,[23] before the task was taken away from him and completed by M&P.

14

15

---

16   [22] Richie initially favored an LLC structure where he owned 50% of the

17   membership units.  He also wanted a permanent role on any Board with Observer
     rights, and information or audit rights in perpetuity.  It was particularly important

18   that executive termination for "Good Cause" require *gross* neglect or

19   recklessness.  Richie removed a provision from the Term Sheet to agree to have a
     buy-sell provision in the future business structure, saying that if a

20   member/founder needed to leave, then it would be a "**negotiated exit**" by

21   "**mutual consent**".  As with Kitara.

22   [23] For example, in the July 10, 2016 response to the questionnaire, Foley &
     Lardner asked for "Name(s) and *Address(es)* of Initial Director(s)."  Richie

23   responded "**Initialaly its just Tzraction and Scale LLC.**"  Foley asked, Please
     list each of the corporation's *founders* who will be contributing any form of IP

24   (e.g.: software code, product designs, business plans), or any other asset to the
     corporation upon formation, along with the fair market value of such asset."

25   Richie wrote "FindMeink.com website, datbabase of leads and parlors and artists

26   and code. Traction and Sale research and development on tattoo industry." Foley

27   asked, "Please list any other *person* who has worked on the corporation's IP to
     date, or, who will be contributing other assets to the corporation, other than the

28

55.     M&P's experience with the term sheet and questionnaire was to become the recurring reality of working with Richie: he would hand in illegible[24] work ("just a draft"), then ask for thoughts and suggestions until it was easier to redo the work from scratch.  Then Richie's feelings would be hurt and he became defensive because he didn't feel respected, and he would refuse to communicate for about a week.  Richie preferred to delegate "finalizing" his work to others, as with his ghost writers.

56.     In the meanwhile, Richie was making little progress on raising capital from Defendant Doe 1 or the other investors he had in mind.  For example, on February 24, 2016, Richie said that Defendant Doe 1 would be able to finance the $1M to $1.5M alone if a deck were prepared for Doe 1.  On March 3, he said that the "slide deck is perfect," "gorgeous" and "ready to use as-is" but when Doe 1 later looked at it, he immediately required Richie to make changes.  Two days later, the time frame was 3 weeks to finalize the details and a month to get capital funded.  Interestingly, he had talked to several tech contractors and filed several roles that would have consumed most of the capital raised.  By March 14, Richie had talked with Doe 1, who had reconfigured the plans for the company so that the three managing members of the LLC would be the M&P CEO, Richie, and Doe 1.  On March 17, Doe 1 told Richie that he liked M&P's position and sent over new questions, and said that Doe 1 was talking to 4 other investors to raise the total amount.

57.     When M&P suggested that the next conversation be directly with Doe 1, Richie said "that's not how I like to do things", and hoped M&P would sign an NDA that day so he could work on "finalizing" the company structure. M&P

---

founders listed immediately above." Richie's written answer was "Domain names".  Explaining the questions over the phone did not seem to help.

[24] Richie would seize on any typo by other Directors.  **Because Richie is that kind of guy.**

personnel were skeptical of Richie's talk, and proceeded with caution.  Absurdly, Richie said on March 21 that he would "finalize" everything when the money came in, although when pressed for details, he threatened to pull out on March 24th because Doe 1 had "laughed" at M&P's current site.

58.     Around April 10, M&P's CEO had met with Doe 1 personally in New York, and observed that Doe 1 had been tracking M&P's performance metrics over time.

59.     Richie regularly insisted that Defendant Doe 1 was ready to invest in a matter of days if he only had one more piece of information, but once provided, Doe 1 would then want another piece of information.

60.     On May 16, Richie met with Doe 1 for a few hours, and Doe 1 gave his feedback on the slide deck, which Richie did not want to share with M&P, but he made the changes and presented a version that quietly implemented Doe 1's changes. Also, Doe 1 would not be investing personally, but through his employer, Doe 2 or Doe 3, but no further due diligence would be required except verbal assurances.  Richie was warned that if a revised financial model or business plan was needed, these would be difficult to prepare on short notice, but Richie said they would not be needed for Doe 1 to invest.  On May 24th, Richie promised that Doe 1 was now ready to invest, but only wanted a new pitch deck, a financial model, and a one-page summary.

61.     On July 14, 2016, Richie sent a revealing email Exh. 24 [wB05]:

> I had been informally working with [Doe 1] on this for many years.  We hadn't formally discussed structure between him and me.  **I just made assumptions** from our conversations as a guideline and then **what he wants to do** evolved as we've evolved.
>
> [He] suggested feedback on our materials (which **led** to the latest model and deck edits . . . . He also wants to know what the deal

is and asked me **what special terms[25] we can give him for pushing me and helping me on this for years**.  I asked him what he wanted and **he said we'd figure it out.**  [bolding added]

62.    The goal here is not to catalog each interaction, but to demonstrate that Riche was following Doe 1's lead, taking his direction and was not exercising independence in closing a deal without Doe 1's permission.

63.    It is believed Richie shared TTI's confidential information and business plans with Doe 1 in violation of the Intellectual Property Assignment Agreement of Aug. 23, 2016 ("**IIPAA**"), which imposed confidentiality obligations in addition to those in the Reciprocal Nondisclosure Agreement of April 10, 2016 ("**RNA**"). Richie sometimes held up the work of the TTI Board because he wanted to consult with Doe 1 first.  He resisted attempts by other TTI directors to communicate with Doe 1 directly, asking on July 18 and November 1, 2016, for the chance to "level up" with Doe 1 on what he had told the TTI Board and what he had told Doe 1.

64.    Based on the pattern of known communications, the timing of Richie's actions, as well as direct admissions by Richie and Doe 1, it was obvious to everyone that Richie lacked independence as a director and was "**beholden to**" Defendant Doe 1 and that, since Oct. 2015, they coordinated to direct the actions of TTI for their eventual benefit.  These were a continuing violation of the fiduciary duties he owed to TTI as a Director, including those of care, loyalty, disclosure and good faith, to put the interests of the corporation above his own and those of his friend and mentor, Doe 1.

---

[25] Doe 1 "wants to feel special," Richie said of the sweetener.  Richie never explained what the sweetener turned out to be, and said that Doe 1 had become embarrassed when Richie brought it up.  At times, he suggested the sweetener would come out of his own shares, so it didn't concern the other members of the Board.  If so, the transaction was never recorded in the register of shares.

65.     In the end, the SAFE investment on Sept. 28, 2016 by Defendant Doe 1's employer Defendant Doe 2 was only $50,000.  Richie's rolling misrepresentations delayed the funding of the corporation by 6 months.  The time M&P spent pursuing this investment based on Richie's promises of imminent capital wasted corporate time and resources.

66.     Afterwards, Richie was asked, "Why did it go bad?"  Richie responded, "**Andrew was my f✱ckup.**"  He said he usually followed two strategies.  After the investor process was slow, for some reason he didn't follow either strategy.  "I didn't follow what I would recommend to people.  I didn't think about it until the last few weeks.  I made a mistake." Call of October 31, 2016.

**C. Defendant Richie Hecker arranges a $10,000 kickback from the Development Agreement**

67.     As a promoter of what would become TTI, Richie owed a fiduciary duty to the investors, including those who would become shareholders of the corporation. By agreeing to merge with TTI, M&P invested in TTI, and the shareholders of M&P became shareholders of TTI.

68.     On March 3, 2016, when asked "Will the investor expect FMI to send a Request for Proposal to other developers for comparison?", Richie responded

> no. we'd like to bring in folks we've worked with before that has built systems for 10MM+ users. We woud invision bringing in an advisor to help with SEO and building the search engine (Ricky), Social/Design (george), Mobile (RaaR) and Product (Christian) and possibly one to help with media buying (mutesix.com) . this should round out the team. ill make intros to everyone next week and we can formalize in conjunctin with the deal.

69.     Frustratingly, Richie wanted to wait until after funding before discussing timelines and deliverables from his dream team[26] of former associates.  Exh. 25 [wD08].

70.     On March 21, 2016, he said he was "80-90% sure that we'll hit those costs now," and promised these details would get "finalized" after the money came in. Richie's plan was to spend most[27] of the investment raised on long term service contracts with his tech friends, although this was eventually negotiated down to "at least 35%"  Exh. 23 [wC18].

71.     Around May 14, 2016, Richie informed M&P that he had negotiated a deal with his friend and business associate **George Spanoudakis** to develop Find Me Ink's mobile apps and website in Greece for about $95,000.  In a telephone call on May 16th, he told M&P not to ask other developers for bids because he trusted only George, even though M&P was already scoping the development project with a local developer.

72.     On July 24, 2016, Richie recommended George over other options.  Exh. 26 [wD09]:

---

[26] For example, on March 5, 2016, he had filled the Product Manager role with Christian M. at salary of $110,000 per year.  "All these people are available, or I wouldn't have proposed them."  Yet he hadn't actually asked Christian for his availability yet, but he said he could "make it happen" so Christian would be available.  Even if his role would to become part-time and $5000 per month. Defendant Doe 1 suggested that Christian was too inexperienced for the position, but he remained under consideration, perhaps due to his strategic family connections that Richie hoped to pursue for a different project.  Around March 21th, Richie was offering Christian for $2500 a month in the role of "lead advisor", but by then he was seeking a full-time position.

[27] This appears to be what happened with T&S's portfolio company Hinter.co, which raised about $300,000 and spent about $120,000 to $200,000 on technology, using George Spanoudakis at least in part.

**George:** George did our deck and a first draft of the web design. He also reviewed our code base and understands the project. He is also willing to offer credit. His design is very good. My background with George goes back almost 10 years. We were both involved early in Facebook apps. George was one of the top independant developers at the time and I was involved with a popular app and a non profit app. We didn't work together though remained friendly in touch. When we did Bloomberg Nation.org[28] a few months ago, George stepped up and did the design work and helped produce the videos as part of the movement. Then when he left his last startup, i helped him get his outsourcing business off the ground and referred him projects, encouraging him to build it up. I recommended George to Hinter and my sister.

George is a celebrity entrepreneur in Greece. He is the first tech CEO to raise money in and move to silicon valley and is very connected in the country's government and tech ecosystem. The downside is he is overseas and sometime is fast and sometimes is slow.

73.    From July to August, M&P CEO Mahoney and Plaintiff Fan negotiated with George on what work would be delivered for the $95,000 and on what schedule, finally agreeing to several milestones to be performed by George's new entity **Jynglee** Internet Services Ltd (a Cyprus company for tax reasons).

74.    Sometime around August 11, 2016, Richie or George added a new provision that "In any case a minimum payment of $10,000 out of the invoiced, unpaid work

---

[28] This video of "Action Mike" Bloomberg portrayed the former NYC mayor as an animated superhero, rousing to take a call to save America (from Chinese businesses) by entering the 2016 presidential race accompanied by a dancing rabbit.  This was just one of Richie's many Lucy Ricardo schemes to break into the political circles. Exh. 27 [wD10]; *see also* "Why Tech Entrepreneurs Should Support a Bloomberg Bid for the White House," *TechCrunch* (Jan. 24, 2016) Exh. 28 [wA26].

will be paid to the Developer 100 days after the Effective Date." Exh. 31 [wD03]. When Richie was asked about the surprise payment, on August 18th, he said he didn't know where the $10,000 payment term came from [email of Aug. 18, 2016], but at this late stage it should stay in or George could pull out of the deal. M&P's CEO rejected the payment provision, email of August 18, 2016 Exh. 32 [wD16], and George agreed to drop it.

75.    Plaintiff Fan sent the signature-ready version of the Website and Mobile Applications Development Agreement ("**Development Agreement**") to George and Richie for signing on August 19, 2016 at 9:05 a.m. PDT Exh. 33 [wD13]. George signed the agreement at 11:26 a.m. PDT Exh. 34 [wD02], and Richie countersigned the agreement, sending it by email at 1:47 p.m. PDT Exh. 35 [wD04]. *See* Development Agreement Exh. 30 [wD01],

76.    Richie's email accompanying the fully executed Development Agreement read:

> Gentlemen,
> Attached is the signed agreement. Congratulations! Let's make this awesome together:
> You guys should already know this though to document it - for the purpose of disclosure.
> George: I am Chairman of TTI/FMI.
> FMI: I am advisor to George's development studio and he is an advisor to Traction and Scale - specifically to our portfolio company RaaR Studios/IVANA and will likely build my sisters game
> Richie

77.    Richie followed up this email with a group call carefully repeating this "disclosure" verbatim from New York to Plaintiff Fan (in San Diego, California), CEO Mahoney (in Chicago, Illinois), Director McKim (in Atlanta, Georgia), and George Spanoudakis (in Greece).

78.     In a later call, **George Spanoudakis directly told TTI directors Mark Mahoney and Jordan McKim that Richie had negotiated a $10,000 payment for himself** to come out of the $95,000 TTI was to pay Jynglee under the Development Agreement, which was certainly news to the rest of TTI.

**D.  TTI terminates the Development Agreement, thwarting the kickback to Defendant Richie Hecker**

79.     Despite Richie's endorsement of George's previous work, Jynglee was unable to meet any of the development milestones in the agreement, even when given extensions of time.  There was no apparent project management experience on the team, and team members were unaware of the contract deliverables.  The buggy and crashy version of the iOS app that Jynglee presented in December 2016 was able to upload photos, but did not include a functionality to take photos down.  Users could log into the app, but George said that logging-out was beyond the scope of the project and would cost extra.

80.     Ultimately, Jynglee was unable to deliver a functional or stable product, and missed all of the milestones in the agreement.  Around December 19, 2016, it became apparent that George had not shared the entire project specification with the Jynglee team, causing a panic in Greece.  On December 21, the TTI Board called on Richie to bring Jynglee up to speed in an email Exh. 36 [wD17]:

> Richie, you recruited Jynglee as a company that you trust, and recommended their hiring for this project.  As a Board member, you are on notice that Jynglee has missed its milestones, is in breach, and the Board is obligated to develop a plan to ensure the timely launch of the MVP.  This should include requiring Jynglee to hire additional personnel (as required by the agreement) to meet its obligations, or hiring a different development firm to bring the project to completion, at Jynglee's expense.  This is a

1
2

problem that you should be managing actively as a Board member.

3
4
5
6
7
8
9
10
11
12
13

81.    On December 22, 2016, George admitted that the project was months behind schedule.  On December 26, 2016, Richie began looking into the progress of Jynglee, and said "It sounds like George had his own concept of what the deliverables were" and tried to negotiate extensions of time on George's behalf so Jynglee would not incur a penalty for late performance.  On December 30th, George reported the "bad news" that his team had not prepared for the website version of the product.  On January 8, 2017, George revealed that the iOS version of the app he had been working on did not include iPad functionality, and "We can't just assume things."  The TTI Board discovered that Richie was sharing confidential information with George in back-channel communications.  TTI terminated the Development Agreement on January 18, 2017.

14
15
16
17
18

82.    Even after termination of the contract, Richie tried for weeks to arrange partial payments to George for the work he had completed to date, at least "a token amount."[29]  The code and work product from Jynglee was independently evaluated by an outside expert, and none of it was useable, so the next developer had to start from scratch.

19
20
21
22
23

83.    Richie's fraudulent omission of his $10,000 kickback arrangement from Jynglee was directly related to TTI's acceptance of Jynglee's Development Agreement and to completion of the merger of M&P with TTI to manage and commercialize the product.  Jynglee was unable to perform under the agreement,

24
25
26
27
28

[29] *See also* Richie's email of July 24, 2016, Exh. 26 [wD09]: "It took [M&P] several months to get back to George . . . . Regardless of who we choose, we should compensate them for their previous time".  At the time of the email, George's designer had helped design a slide deck that was unusable and had to be recreated in-house from scratch.  Richie still insisted on paying George $3000 for the deck.

and after giving Jynglee several extensions to complete the work, TTI terminated the agreement.  TTI's Board had to urgently search for and engage a replacement developer to mitigate the loss of at least 5 months of production schedule, the loss of projected revenue and the expenditure of internal costs.

84.     The replacement developer ("EQ") was to be initially paid $13,500 plus 357,143 shares of stock, but the eventual development cost to TTI far exceeded the original estimate.  During this time, TTI incurred personnel expenses, including payroll of at least $13,528 per month.  Richie's fraudulent inducement to work with Jynglee and merge M&P delayed the launch of the Minimum Viable Product and the value of company fell from the $2.8 million Valuation Cap (which Richie promoted and negotiated in five SAFEs) to nil.

**E.  Defendant Richie Hecker admits the $10,000 kickback arrangement**

85.     Richie's efforts to pay Jynglee at least something (less than $20,000) for his effort raised the suspicions of TTI's Board.  After investigation, Richie admitted his kickback arrangement and its omitted disclosure during the Board call of November 3, 2017, with his attorneys attending.  Richie did not dispute that he *arranged* the kickback with George, but that he had no affirmative duty to *disclose* the arrangement (which he actually did as a corporate promoter), and that in any case he did not *receive* the $10,000 benefit because the agreement had been terminated early.

86.     On the call, Plaintiff Calvin Fan said, "Okay, I would say that if all of those things were true, it doesn't change the fact that you *negotiated* a kickback, and that's a breach of your fiduciary duty."  Richie: "Calvin, it was disclosed [in a call prior to signing] that I was an *advisor* to the company—that implies certain compensation.  No one ever asked the question of what my deal was with George for anything I did with him.  I would have answered if said question was asked, but

it was not, to my recollection." [ . . . ] Calvin: "As far as disclosing whether you're getting a kickback or not, which George described to us, anyone who's on a board or has a fiduciary duty should be disclosing all the different relationships they have. The $10,000 kickback was not a part of the other stuff that you were doing with George and with your sister. It was a kickback specifically to come out of the money we paid to George. The fact that he did a terrible job and we terminated the agreement does not solve the problem of why we got stuck with George in the first place and the kickback." [ . . . ] Richie: "If you're going to continue to try to trap me in a corner and make me wrong for a kickback I never received, it's not going to go anywhere. It's disclosed in the papers[30] that I am an advisor to the company. *You never asked the question, Calvin, of what my compensation is.*"

87.    Richie therefore maintains that he adequately disclosed his prior association with George, and that as part of M&P's due diligence, the burden was on M&P to ask Richie if he was getting a kickback.[31]  To the extent Richie made any voluntary disclosure, he waited until safely *after* the Development Agreement had

---

[30]  Plaintiffs have been unable to find any such disclosure paper, except for Richie's post-execution email of August 19, 2016.

[31]  At this point in the call, Richie found religion: "As a policy going forward, I think it is best for anyone to disclose and with specifically what relationships are with anyone who is even a related party to any member of the board and anyone who is a signer or sign off on any material contracts, and including asking the questions of if they are an advisor or a shareholder or an investor to the extent they can legally disclose what their exact role, ownership, or said compensation to be disclosed and should be approved in advance by the Board. I think that is a very good thing that should . . . *I'm going to recommend that,* going forward, to avoid issues like this. Because I did disclose that I was an advisor, but I did not disclose any specifics, and going forward I think we should do this. . . . And going forward with the Board, I would highly recommend that these things be determined very clearly. . . . Now I agree we could do better going forward. These things could have been done in a clearer way and in a way that's *more concise.*

Complaint                                          30                                          18cv_____

been signed before his alleged "disclosure" by email Exh. 35 [wD04] and by conference call.

88.    Richie claims in mitigation that he originally favored a local developer, Matt, but this does not match Plaintiffs' recollection or his email of July 24, 2016, Exh. 26 [wD09].  He also tried to put two of his other T&S friends into play, including Jordan Pasternak (an MBA who was to run a T&S venture fund in 2015 that was never funded).

89.    Richie also claimed in mitigation that when the TTI Board voted on terminating the Jynglee agreement, he cast the first vote to fire George.  Richie forgets that Plaintiff Fan was chairing the meeting during the termination vote, and elected to ask Richie for his vote first before asking the others directors to vote.

90.    Richie's attorney Lili Rogowsky then advanced the novel legal theory that, "everybody here has a fiduciary duty to the company to move past this and look to the future . . . ."  In the same call on November 3, 2017, Richie denied he had arranged kickbacks from other tech service providers or any investors.  However, he conceded that if TTI had hired Arsen Pereymer, whom Richie had pressed M&P to hire since March 3, 2016, Defendant Hecker would have received some compensation back from Mr. Pereymer, because Defendant Hecker and Mr. Pereymer had a pre-existing "advisor" relationship.  At the time, Mr. Pereymer had an app studio "RaaR", which was "a portfolio company" of Defendant Traction & Scale, even though it was unclear what services RaaR could provide due to its lack of web presence.  When asked about presenting RaaR's proposed role or qualifications to potential investors, Defendant Hecker said "We do not need to

convince the investors to go with RaaR." Call of March 3, 2016. Defendant

Hecker continues to promote himself and Arsen.[32]

**F.  Review of Formation of Tattoo Technologies, Inc. (TTI) and Merger with M&P**

91.     To resume with the facts of the formation of TTI: after the Term Sheet

between M&P and T&S was signed on April 25, 2016 Exh. 23 [wC18], the parties

interviewed several law firms to handle the formation of TTI.  Richie engaged

Foley & Lardner LLP on July 11, 2016 Exh. 38 [wC19].  A Certificate of

Incorporation was filed in Delaware on July 28, 2016, Exh. 39 [wC07], with Richie

as sole incorporator and director.  Richie's fiduciary duties as a director to TTI and

its shareholders began at this point until his termination on November 6, 2017.

92.     On August 23, 2016, a first set of documents were signed by Richie,

including a Common Stock Purchase Agreement, which sold him 1,500,000 shares

of TTI stock Exh. 40 [wC10] in exchange for an Intellectual Property Assignment

Agreement (IPAA) Exh. 41 [wG05], which contained confidentiality provisions at

issue.

93.     In a second set of documents, M&P agreed to merge with TTI on September

2, 2016, converting shares of M&P stock into TTI stock.  Plaintiff Fan received his

492,712 shares of TTI stock in exchange for an Intellectual Property Assignment

Agreement.  The merger was completed by September 6, 2016 as a tax-free

transaction.  Exh. 49 [wG01] § 1.6.

94.     In a third set of documents, signed October 4, 2016, half of the shares

granted to the current directors (and Plaintiff Fan) were put under stock restriction

---

[32] WAMVentures Forum on April 25, 2018 as CEO - Traction + Scale and Co-founder, Crypto Working Group.  https://www.eventbrite.com/e/wamventures-forum-blockchain-crypto-markets-insights-tickets-44821356885

agreements to vest over 36 months.  For example, 750,000 shares of Richie's common stock was released to him and 20,833 shares were vested to him each month thereafter under the Stock Restriction Agreement of Oct. 4, 2016 Exh. 42 [wC06].

95.    Plaintiff Fan joined the TTI Board of Directors on May 2, 2017.

**G. Defendant Richie Hecker sells securities as an unregistered Broker**

96.    Although Richie's title was Chairman[33] of the Board, his only substantial duty was fundraising.[34]  Defendant Hecker is not and has never been an SEC-registered broker-dealer, though he has acted like one throughout his career as a serial entrepreneur.  Richie assured Plaintiffs he had been doing this for years and had talked about this with friends who are attorneys.

97.    "If you get compensation to do a capital raise, you need to be a broker," Richie explained to Plaintiff Fan.  You need a broker's registration if you get a percentage for a capital raise.  That requires getting a license and studying for an exam and expensive fees.  But "It's fine if you start a new company and then

---

[33]He did not chair any meetings of the TTI Board, and was unsure of the corporate organization of the corporation. "Can you confirm we're a C corp and not an S Corp?"  Richie's email of April 21, 2017, Exh. 43 [wE05].  On September 11, 2017, he was uncertain how many shares and what type of stock he held.

[34] On July 14, 2016, prior to formation, Richie was asked, since M&P was doing all the work, "What value do you bring to Find Me Ink?" and he admitted he had never been asked before to justify his value.  Prophetically, he said he hadn't brought any value to the company so far, but value would be realized in the future by (1) bringing in capital, (2) his leadership and organizational skills, (3) his connections with tech like George Spanoudakis and Arsen Pereymer.  Call of July 14, 2016.  Richie's leadership and organizational skills were so bad that these roles were taken away from him.  As for item (3), Richie was an "advisor" to both George and Arsen, and in his telling, using them would have resulted in compensation to Richie.  George was unable to meet any milestones in the Development Agreement, and that agreement was canceled.

merge a new company into it.  He knew it wasn't a problem because he had done it before.  With *lawyers*.[35]

98.     Plaintiff Fan asked Richie on July 11, 2016, "What if investors ask 'What's your valuation?'"  Richie said "You're asking for an answer that doesn't exist" because "valuation isn't a science.  It's the confidence that investors have in a venture.  We only have confidence and leverage."  Confidence meant Richie telling investors we have half of the parlors in the U.S. signed up and will make $25M.  Leverage meant there are so many other investors who are willing to invest at a higher valuation, so don't miss out.  So Richie dug in his heels for a $3.5M pre-money valuation.  *See* Richie's valuation models in Exhibit 48 [wC21].

99.     Over 21 months, Richie was ultimately able to raise only $185,000 of the $1.5 million he claimed to have lined up for the first 30 days.

100.    As Richie's previous business partners reported, Richie knows many people and is able to cast a wide net as a "super connector".  *See* Exh. 9 [wA29].  The problem is most of them have already formed an opinion about him.[36]  For some, this meant Richie was introducing distressed investors to distressed companies, where any deal was far from optimal for either side.  In retrospect, he negotiated poor deals for the company and its shareholders.  As Richie admitted on October 16, 2016, he is more about "relationships and bringing people together," not execution.  Despite portraying himself as an expert negotiator, he often seemed to take the side of his friends and pressed TTI to accept less advantageous terms,[37] so that in many deals, Richie had to be excluded from the final negotiations.

---

[35] Call of August 2, 2016.
[36] To paraphrase my bubbe A"H, *Er veys file ober file im* kenen.
[37] For example, Richie "negotiated" a proposed Revenue Loan Agreement with *Investor J* with a 300% rate of return for the investor, and if a payment was late 5 days, the entire balance would become due.

101.   Most of the investors he presented to TTI were his "old friends".  Richie solicited and negotiated SAFE (Simple Agreement for Future Equity) securities, which are a financial instrument created by the Silicon Valley accelerator Y Combinator.  Somewhat similar to a convertible note, a SAFE investment is designed to convert to preferred shares in the company.  Each SAFE had a Valuation Cap that roughly represents the agreed-upon value of the company prior to investment.  The five SAFEs that Richie sold to investors had a Valuation Cap of $2.8 million.

102.   Richie had an inconsistent or selective memory of what he told prospective investors about TTI.  During a long Board call on November 1, 2016, Richie tearfully agreed to abide by two rules:

> **Rule 1**: When Richie communicates with investors *about TTI*, at least one of the other Directors must be on the line.
> **Rule 2**: If Richie has an initial communication with an investor *about TTI*, Richie should summarize the communication as soon as possible in an email to the rest of the Board; all subsequent communications must follow Rule 1.

103.   Shortly afterwards it was clarified that Richie Rules 1 and 2 did not apply when Richie was talking to acquaintances about non-TTI topics, but kicked in once he started start talking about TTI.

104.   Richie deeply resented these Rules and often "forgot" about them.  In one of his later proposals to "streamline" Board communications, he sought to communicate freely with investors without reporting back to the rest of the Board. The importance of these Rules for Richie became apparent in time.

**H. Defendant Richie Hecker interferes with crowdfunding campaign and conducts secret negotiations to sell TTI**

105.   In 2017, Richie's interest in fundraising fell and he became difficult to reach.  On September 11, 2017, the disinterested Board of TTI gave Richie 14 days to cure the violations described above or be terminated for cause.[38]  After no response for 13 days, Richie called TTI's CEO on Sept. 25th with a proposal as a sign of his "good faith" to use his connections with a leading crowdfunding platform ("Crowdfunder") to get TTI accepted for a round of fundraising, and to allow him step away.[39]  TTI agreed to suspend Richie's period for cure, and TTI was duly accepted into the program.

106.   When it came time for the TTI Board to provide a resolution approving the crowdfunding raise, all the Directors signed the action on Oct. 19th, except Richie, who did not respond to multiple attempts to contact him.  On Oct. 24th, Richie asked for time to review corporate materials and, in a meeting he called on Oct. 26th, he complained that he had found minor inconsistencies and had

---

[38] For example, on September 6, 2017, he proposed a "balanced offer" for accelerated vesting with $23,500 to be paid for his services as Chairman.  On Sept. 11, 2017, Richie proposed "separating amicably" if TTI agreed that 20–50% of any new investors' money be earmarked to buy all of Richie's shares at a premium.  Exh. 53 [wH08].  Richie's attorney emphasized that "the key is **he gets bought out**."  During the Board call on November 3, 2017, Richie said, "**All you have to do is buy me out of the company**.  You get shares back.  **I go away**.  You give the other investors the option of getting their money back."  On November 7, 2017, he offered a resignation package that would pay off his SAFE investor friends early from "100% of the proceeds from any asset sales".  During Richie's termination process, he offered to resign voluntarily in exchange for increasingly larger payouts (worth up to $250,000) with preferential security transactions for him and his investor friends.

[39] Richie later disputed whether the Crowdfunder referral and his voluntary resignation were linked, and in any case he began requiring more payments and conditions to leave voluntarily in a "negotiated exit" by "mutual consent".

questions about the organization of the corporation, which were all answered or addressed during the meeting.[40]  Despite the clarifications, at a reconvened Board meeting on Nov. 3rd, Richie voted against crowdfunding, saying "**I would vote No to almost any investor that comes in except for a complete acquisition of the company**" (which was consistent with an earlier statement to the CEO that he would not let a single penny come into TTI), effectively forcing the company to suspend operations.  The Board voted to approve the crowdfunding raise and the meeting was adjourned.

107.   Less than an hour later, Richie began calling the other Directors to present a new idea that had just occurred to him: instead of shutting down the company, to sell it for a low price to Inked Magazine or Bunker Hill Capital.  "**It may not be much money, but at least we would get some money out of the deal and pay back investors.**"  Despite Richie's opposition, TTI moved forward with the Crowdfunder's due diligence process, including an independent audit by a CPA firm.[41]  The Form C Offering Statement was submitted to the SEC under Regulation CF on Nov. 15, 2017.

108.   It is believed that Richie was motivated to do this in part to keep the value of the company low for an easier acquisition or merger by Inked Magazine or Bunker Hill Capital with whom he was negotiating with in private.  This wasted the

---

[40] All the issues raised by Richie were addressed and fully disclosed to Crowdfunder, its CPA audit firm, and in the Form C submission to the SEC on November 15, 2017.  Richie should consider his part in recklessly communicating false information to investors like Defendant Doe 1 without confirming the information beforehand.

[41] It became increasingly clear that TTI's officers could not in good faith sign certain representations to the SEC as long as Richie remained part of the company, and Richie was terminated by the disinterested Board on Nov. 6th. Richie gave some resistance to the termination letter, but was unambiguously terminated Nov. 10th, not without incurring unnecessary legal costs.

company's time and resources to support the Crowdfunder's on-boarding process, preparing marketing and pitch materials, due diligence, Form C submission, and campaign, hurting the value of the company and its shares of stock.

109.   Throughout his term as Chairman, Richie explored potential deals in secret with industry competitors and potential business partners, despite repeated warnings and agreements for him to disclose all TTI-related investor communications to the Board, whether initiated by him or not.  The Board became aware of these undisclosed contacts because they called or emailed TTI directly to confirm whether Richie was working on TTI's behalf, sometimes bringing up TTI's internal information that was not public.  When asked about these contacts, Richie initially denied any involvement, but when prompted with specific information, his recollection became hazy about whom he had talked to over time, ostensibly without notes or emails.

110.   For example, Richie also contacted inkHunter on or around July 12, 2017, despite being instructed by the Board not to.

111.   On November 3, 2017, Don Hellinger of *Inked Magazine* called TTI and volunteered that he had been in touch with Richie several times over the past year about acquiring TTI, and was aware of nonpublic information about a new partnership TTI had recently formed.  On November 3, 2017, he admitted to also talking to *Inked Magazine* a few weeks before.  Calvin: "**Did [Doe 1] ask you to do that?**"  Richie: "The second time?"  Calvin: "*Any* time."  Richie: "I don't recall."  Richie suggested that **Doe 1 had himself spoken to a few people who were potential acquisition partners**, but Richie did not know who they were. When asked how *Inked Magazine* would get this information, Richie said he didn't know.

112.   On November 5, 2017, when TTI directors asked Richie why *Inked Magazine* would report multiple contacts with him over the past year, he asked

whether it was possible someone was impersonating him or that his email had been hacked.  He also suggested that perhaps it was **Defendant Doe 1 acting on his own who had contacted *Inked Magazine* and was the source of the leaked information.**

113.   On November 6, 2017, Richie proposed terms for his resignation in an email Exh. 54 [wH06].  "**I believe . . . that there would be multiple parties interested** [in a sale of 100% of the company] **and that a successful transaction will occur."** This strongly suggests that Richie had interested parties in mind—perhaps Bunker Hill Capital, *Inked Magazine*, or inkHunter—that he had knowledge of **but did not tell** the TTI Board.  He favored a 100% sale of the company: "However, if the company proceeds with consenting to solicit for a minority investment or note

114.   transaction, then I would want a liquidity option for everyone who holds SAFE notes and for myself as part of my divorce from the company."  *Id.*

115.   These contacts and nondisclosure breached his duty of candor to TTI. Richie often complained about the lack of trust he was feeling from other TTI directors, claiming he had an "open kimono".  His ongoing communications with others also breached the Reciprocal Nondisclosure Agreement of April 10, 2016 ("RNA"), between M&P and Traction & Scale, which is still in effect.[42]  Richie was reminded of his obligations under the RNA, but has not responded to requests for the return of confidential information.

---

[42] Richie did not take NDAs very seriously.  Around October 5, 2016, Richie bragged that he had signed "dozens" of NDAs in just the past few weeks, unlike his friend Michael Barr, who read them carefully before signing.

## I.  TTI terminates Defendant Richard Hecker as Chairman and Director for cause

116.    In October 2017, the Board considered the Crowdfunder's due diligence questions, including "Are there any known or alleged violations of securities laws, regulations, or other known illegal acts?  Are you aware of any noncompliance with laws and regulations?"  During a Board meeting on October 29, 2017, Richie was asked to provide some **legal assurance that he was not in violation of the SEC's law on broker dealer registration**.  On November 3, 2017, Richie called a special Board meeting with his attorneys Eric Benisek and Lili Rogowsky on the call to defend him.  After 90 minutes into the call, Director Jordan McKim asked "If we could simply just get an answer—Yes or No—'I was in compliance [with the SEC safe harbor provision]' or 'No, I was not in compliance.'  Can we get a simple answer?  The whole reason you guys were brought onto this call was because [Richie] was not comfortable with telling an answer.  Can we just get that answer, yes or no?  It's that simple."

117.    Attorney Rogowsky replied, "I don't think there's anyone here who can give you a simple yes or no answer.  I think everyone here has looked into the question, and it is not a simple black and white, yes or no.  That's not how the law operates.  This is a particular law that has a lot of gray area, and **I don't think anybody would feel comfortable saying yes or no,** especially when we're operating off of different facts."[43]

118.    After some back and forth, Jordan observed, "Do you realize this is the first answer you've given us in this entire hour-long call?  That is the first answer you've given us.  And this is all we've been trying to accomplish."  It was Jordan's Perry Mason moment.

---

[43] Attorney Rogowsky no longer represents Defendant Traction & Scale LLC.

119.   Richie had been required by the Board to come into compliance with SEC securities law on September 11, 2017, and was unable to cure the violation, and accordingly was terminated for cause on November 6, 2017.[44]

**J. Demand that the TTI Board take action against Defendant Richie Hecker**

120.   Since October 4, 2016, at least 246,356 shares of TTI common stock have been owned by Plaintiff Fan or by the Find Me Ink Trust.  Exh. 44 [wC12].

121.   On April 18, 2018, a written demand was made on every member of the Board of Directors of Tattoo Technologies, Inc., individually, and collectively as the Board of Directors, to bring an action against Named Defendants by May 2, 2018, to recover from them "the sum of at least $3,500,000, the value of the property of TTI that has been wasted and lost to TTI by Richie's wrongful and negligent acts as a promoter, Director, and Chairman of the Board of Directors of TTI".  The Board of Directors has not brought the demanded action.  The Plaintiffs are informed and belief, and allege on information and belief, that the reason for the Board's refusal to comply with the Plaintiffs' demand was lack of resources for litigation.  A copy of the demand, marked Exhibit 45 [wI01], is attached and incorporated by reference.  Since the date of the demand, no change in the membership of the Board of Directors has been made.

122.   Plaintiffs do not presume that a serial entrepreneur will be truthful 100% of the time.  However, if Richie performed a fraction of what he claimed to be able to do—fundraising, organization, negotiation, strategy—there would be little issue.

---

[44] The CEO consulted with Defendant Doe 1 before undertaking Richie's termination, and believed that Doe 1 indicated that Richie was standing in the way of TTI's success and should be removed.  Doe 1 stated that Richie had been down on his luck and Doe 1 was only trying to throw him some help.  However, Doe 1 later expressed dismay that Richie had been terminated.  This much is hearsay.  Plaintiffs may never know the exact nature of Doe 1's relationship with Richie, and how beholden Richie was to Doe 1.

After being called out on his big talk and failed promises, Richie could only tell the young founders of M&P, "It really feels really shitty to be in my shoes right now." The Board of TTI had offered to let Richie leave, and live and let live, but he worked to sabotage the company as leverage for his personal gain.  The gravamen of this case is whether Defendant Richie Hecker should continue his 17-year career of self-dealing destruction for young entrepreneurs, start-up companies, and their investors?

## Count 1: Violation of federal Securities Exchange Act of 1934 (against Defendant Hecker)

123.   Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

124.   Section **15(a)(1)** of the Securities Exchange Act of 1934 makes it "unlawful" for anyone to "effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless registered as a broker or dealer with the SEC.[45]   The SEC does not regard this behavior as a shadowy gray zone: "If you will be acting as a 'broker' or 'dealer,' you must not engage in securities business until you are properly registered.  If you are already engaged in the business and are not yet registered, you should cease all activities until you are properly registered."[46]

125.   A private right of action exists to enforce Section 15(a)(1). *Landegger v. Cohen*, 5 F. Supp. 3d 1278 (D. Colo. 2013) (finding word "unlawful" in SEC code creates an implied cause of action); *Gotshall v. AG Edwards*, 701 F. Supp. 675 (N.D. Ill. 1988); *Onesti v. Thomson McKinnon Securities, Inc.*, 619 F. Supp. 1262 (N.D. Ill. 1985).

126.   A serial entrepreneur since age 15, Richie has never registered as a broker dealer with the SEC.

127.   Richie engaged in the business of effecting transactions in securities for TTI by soliciting and negotiating SAFE securities, and pursuing transactions in TTI

---

[45] Codified at 15 U.S.C. §78o.  *See* Sec. 3(a)(4)(A), codified at 15 U.S.C. § 78c(a)(4)(A) (defining broker as "any person engaged in the business of effecting transactions in securities for the account of others"); Sec. 3(a)(5)(A), codified at 15 U.S.C. § 78c(a)(5)(A) (defining dealer as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise").

[46] *See* note at Sec. II.C. of Guide to Broker-Dealer Registration, available at https://www.sec.gov/reportspubs/investor-publications/divisionsmarketregbdguidehtm.html

stock.  As a promoter of TTI from about March 2016 to the formation of TTI on July 28, 2016, he initiated and orally solicited securities transactions for investment from Defendant Doe 1, which was consummated as a SAFE investment by Defendant Doe 2 on October 4, 2016.  As Chairman and Director of TTI from July 28, 2016 to November 6, 2017, he further initiated and orally solicited securities transactions from numerous potential investors, which resulted in various SAFE investments on September 12, 2016, Nov. 3rd, Nov. 12th, and Nov. 15th.

128.   The SEC provides a "**safe harbor provision**" to allow "associated persons" of an issuer to perform ministerial and clerical work for the issuer under limited circumstances to be "safe" from being deemed by the SEC as brokers who must become registered.  SEC regulation 3a4-1(a), codified at 17 C.F.R. § 240.3a4-1 (1985).  However, this safe harbor provision does not protect associated persons whose have no substantial duties other than securities transactions at the end of the offering.  *Id.* (a)(4)(ii)(A).

129.   Although Richie's title at TTI was Chairman of the Board, his only substantial duty was to work his network of contacts to raise investment for TTI through securities transactions.  On occasion, he was asked to perform minor tasks, such as looking up what companies could issue gift cards[47] or to brainstorm ideas for public relations, but these were not substantial duties, and represented a tiny fraction of his emails.  In any event, these minor tasks were taken away from him because he was incapable of making progress on them.  On November 1, 2017, days before his termination, Richie began emailing to the Board some job descriptions and ideas for projects, perhaps on advice to demonstrate he had some substantial duties other than fundraising.

---

[47] On June 14, 2017, he explained his inaction on the gift card project because he needed help: "I am waiting on an overview from you on gift cards."

130.   The safe harbor provision also does not protect associated persons who participate in selling **an offering** of securities for any issuer **more than once every 12 months**.  *Id.* (a)(4)(ii)(C).  From March 2016 to March 2017, Richie offered and sold at least five SAFE securities, having non-identical terms.  For example, the SAFE securities sold to Defendant Doe 1 contained a more favorable distribution provision "prior and in preference" to other shareholders, instead of "pari passu".  Two SAFEs sold May 1, 2017 contained an effective 15% Discount Rate unlike the previous SAFEs.

131.   During Richie's term as Chairman, the Board requested at several times and finally required him on to reduce corporate risk by demonstrating compliance with the SEC safe-harbor provision 3a4-1.  On Nov. 3, 2017, then-attorney for T&S Lili Rogowsky said she and others had investigated Richie's potential compliance with 3a4-1, but admitted nobody "would feel comfortable saying yes or no."

132.   Unregistered brokers must return compensation they received.  Securities transactions negotiated by unregistered brokers may have to be unwound and offer to be refunded to investors.  Thus, Richie's violation of the SEC's broker deal registration law and refusal to come within the 3a4-1 safe harbor provision threatened the company's own compliance with federal law, and put the capital invested in the company at risk.

133.   To prevent risk of harm to potential investors going forward, Plaintiffs ask this Court for a **preliminary and permanent Injunction** that Defendant Richard Hecker cease further solicitation and negotiation of transactions in securities until such time as he be a duly registered broker-dealer by the Securities & Exchange Commission.

## Count 2: Violation of federal SEC Rule 10b-5 (against Defendants Hecker and Traction & Scale LLC)

134.   Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

135.   Rule 10b-5[48] was promulgated by the SEC (codified 17 C.F.R. § 240.10b-5 (1951)) pursuant to the Securities Exchange Act of 1934 (codified 15 U.S.C. § 78o) to prevent deceptive practices in connection with the purchase or sale of securities.

136.   M&P had **relied** on Defendant Hecker's assurances of the quality of George's work from his previous background with George going back almost 10 years.  Richie insisted on May 16, 2016, that M&P not seek bids from other developers, because Richie trusted only George to do the job.

137.   On August 19, 2016, Defendant Hecker **deceived** M&P about the fundamental terms of the Development Agreement by **fraudulently omitting** the material fact that Richie had arranged a $10,000 kickback with George and Jynglee.  *After* the Development Agreement had been signed by both parties, Richie purported to give M&P and Jynglee disclosure of any conflicts by an email Exh. 35 [wD04].  Shortly afterwards, Richie followed up with essentially the same

---

[48] SEC Rule 10b-5: Employment of Manipulative and Deceptive Practices:

- It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
- (a) To employ any device, scheme, or artifice to defraud,
- (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
- (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
- in connection with the purchase or sale of any security.

degree of disclosure during a conference call with Plaintiff Fan, demonstrating that Richie was aware and had **scienter** of his misrepresentation.  Richie was aware of the significance of the kickback arrangement, because he sent an email and held a conference call after the agreement had been signed to give himself "cover" for the omission by giving a partial disclosure of being an advisor to George.  The fact of the kickback arrangement would have been **material** to M&P's decision to merge with TTI, because M&P (and no reasonable business) would have moved forward with the merger with TTI without fuller disclosure about Richie's conflicts of interest while negotiating agreements for TTI.

138.   Any disclosure of an "advisor" relationship contained in the email and provided during the call nonetheless omitted the material fact of Richie's kickback arrangement.  On November 3, 2017, Richie tried to shift responsibility onto M&F for asking whether he was getting a kickback.  "Calvin, it was disclosed that I was an *advisor* to the company—that implies certain compensation.  No one ever asked the question of what my deal was with George for anything I did with him.  I would have answered if said question was asked, but it was not, to my recollection."  "You never asked the question, Calvin, of what my compensation is."

139.   As TTI discovered, the omitted material fact was Richie's compensation was to be $10,000 out of the $95,000 TTI was to pay developer Jynglee. In fact, Richie or George had tried to insert a special $10,000 payment a few days before signing, and the $10,000 term was rejected by M&P.

140.   The misrepresentation by omission occurred as the Developer Agreement was being negotiated, and continued after the agreement had been signed.  The formation of TTI depended on securing a developer for the company's product, leading to the merger of M&P and TTI on September 2, 2016.  As a result of the merger, M&P purchased TTI common stock in exchange for the assets of M&P.

141.   As a shareholder, Plaintiffs have standing as a purchaser of the TTI company shares.  On behalf of TTI, Plaintiffs also have standing as the seller of the TTI company shares.

142.   Richie's fraudulent omission of his $10,000 kickback arrangement from Jynglee was directly related to Jynglee's Development Agreement and to completion of the merger of M&S with TTI to manage and commercialize the product.

143.   Had M&P known that Richie had arranged a kickback from the development agreement they had negotiated with Jynglee, M&P would not have moved forward with the merger.  If one of the things that Richie brought to the table in forming TTI was "his connections with tech like George", then forming TTI with M&P was a way Richie could turn his investor contacts into direct personal benefit.

144.   Jynglee was unable to perform under the agreement, and after giving Jynglee several extensions to complete the work, TTI terminated the agreement on January 18, 2017.  TTI's board had to urgently search for and engage a replacement developer to mitigate the loss of at least 5 months of production schedule, the loss of projected revenue and the expenditure of internal costs.

145.   The replacement developer (EQ) was to be initially paid $13,500 plus 357,143 shares of stock, but the eventual development cost to launch far exceeded the original estimate.  During this time, TTI incurred personnel expenses, including payroll of at least $13,528 per month.  As a direct result of Richie's fraud causing the delayed launch of the product, the value of company fell from the $2.8 million Valuation Cap (which Richie promoted and negotiated during this time in five SAFEs) to **nil**.

146.   As a direct and proximate result of the actions of Defendant Does 1-5 to induce Defendant Hecker's breach of his fiduciary duties, Plaintiffs have been damaged in an amount to be proven at trial.  In doing the acts alleged above,

Richie acted with oppression, fraud, and malice, such that Plaintiffs are entitled to punitive damages.

**Count 3: Fraudulent Inducement of Merger (Delaware common law) (against Defendants Hecker and Traction & Scale LLC)**

147.   Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

148.   The common law of Delaware permits a cause of action to lie for fraudulent inducement.[49]

149.   Up to the formation of TTI on July 28, 2016, Defendant Hecker acted as its corporate promoter.  As a corporate promoter, Richie had a fiduciary duty[50] to

---

[49] Under Delaware law, a plaintiff must allege that: (1) defendant falsely represented a material fact or omitted facts that the defendant had a duty to disclose; (2) defendant knew that the representation was false or made with a reckless indifference to the truth; (3) defendant intended to induce plaintiff to act or refrain from action; (4) plaintiff acted in justifiable reliance on the representation; and (5) plaintiff was injured by its reliance on defendant's representation.  *ITW Global Investments Inc. v. American Int'l Partners Capital Fund IV, L.P.,* C.A. No. 14C-10-236 JRJ (June 24, 2015) (citing *ABRY Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006)).

[50] "It is well settled that both before and after a corporation comes into existence, its promoter acts as the fiduciary of that corporation and its present and anticipated shareholders."  *Roni LLC v. Arfa,* 74 A.D.3d 442, 444 (N.Y. App. Div. 2010).  A promoter stands "in a confidential relation to the proposed company, and is bound to the exercise of the exercise of the upmost good faith."  *Dickerman v. Northern Trust Co.,* 176 U.S. 181, 204 (1900).  "His acts are scrutinized carefully, and he is precluded from taking a secret advantage of the other stockholders."  *Id.* (citing Cook on Stock & Stockholders, sec. 651).  "Accordingly it has been held that if persons start a company and induce others to subscribe for shares for the purpose of selling property to the company when organized, they must faithfully disclose all facts relating to the property which would influence those who form the company in deciding upon the judiciousness of the purchase. If the promoters are guilty of any misrepresentation of facts or suppression of the truth in relation to the character and value of the property, or their personal interest in the proposed sale, the company will be entitled to set aside the transaction or recover compensation for any loss which it has suffered."  *Id.* (citations omitted).

disclose all materials facts relating to the transaction, especially a suppression of the truth in relation to their personal interest in the proposed transaction binding M&P.

150.   Based on Richie's endorsement of the quality of George's work and their background going back almost over 10 years, M&P and Plaintiff Fan (as the imminent shareholders of TTI) acted in **justifiable reliance on the representation** to move forward with a merger with TTI on September 2, 2016.

151.   On August 19, 2016, Richie purported to give M&P and Jynglee disclosure of any conflicts by an email Exh. 35 [wD04] by disclosing he was an "advisor" to George's company RaaR.  Shortly afterwards, Richie followed up with essentially the same degree of disclosure during a conference call with the board of M&P and Plaintiff Fan.

152.   As a promoter, Richie had a fiduciary **duty** to disclose to the imminent shareholders of TTI (the board of M&P and Plaintiff Fan) that Richie **knew** of the omission at the time, with **intent** that the **omission** of the **material fact** of his kickback arrangement would cause M&P to **act** by moving forward with the merger with TTI on Sept. 2, 2016, and to **refrain** from any investigation of Richie's personal gain from the Development Agreement.

153.   From August 19, 2016 to November 3, 2017, Richie was silent to TTI directors and shareholders about his secret arrangement with George to receive a $10,000 kickback out of the compensation TTI was to pay George.  From the formation of TTI on July 28, 2016, Richie was a director of TTI and bore fiduciary duties to the corporation and its shareholders.

154.   Above and beyond his fiduciary duties as a promoter and director, Richie had a **duty not to perpetuate a continuing fraud** on TTI, its shareholders, and its investors.  The Development Agreement was amended on November 13, 2016 to be backed by a SAFE investment Exh. 46 [wD05].  *See, e.g.,* 11 Del. Criminal

Code § 891 (defrauding secured creditors) ("A person is guilty of defrauding secured creditors if the person destroys, removes, **conceals**, encumbers, transfers or otherwise deals with **property subject to a security interest**, intending to defeat enforcement of that interest").

155.   Richie admitted he knew that the representation was false and incomplete, on the call of November 3, 2017: "I did disclose that I was an advisor, but I did not disclose any specifics, and going forward I think we should do this . . . . *No one ever asked the question of what my deal was with George for anything I did with him.* I would have answered if said question was asked, but it was not, to my recollection. . . . *You never asked the question, Calvin, of what my compensation is.*"

156.   Based on Richie's endorsement of the quality of George's work and their background going back almost over 10 years, M&P and Plaintiff Fan (as the imminent shareholders of TTI) acted in **reasonable reliance** on the representation to move forward with a merger with TTI on September 2, 2016.

157.   As a direct and proximate result of Defendants' fraudulent representations Plaintiffs were injured by its reliance on Defendant Hecker's representation.

158.   On behalf of the former shareholders of M&P, Plaintiffs seek rescission of the merger with TTI.

## Count 4: Fraudulent Inducement of Merger (New York common law) (against Defendants Hecker and Traction & Scale LLC)

159.   Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

160.   The common law of New York permits a cause of action to lie for fraudulent inducement.[51]

161.   Up to the formation of TTI on July 28, 2016, Defendant Hecker served as its corporate promoter.  From his telephone in New York City, Richie deliberately omitted telling M&P he had arranged a $10,000 kickback from Jynglee, founded by George Spanoudakis, who was Richie's friend and previous and current business associate.  Richie was aware of the significance of the kickback arrangement, because he sent an email and held a conference call after the agreement had been signed to give himself "cover" for the omission by giving a partial disclosure of being an advisor to George.  If known to the TTI Board, the fact of the kickback arrangement would have been **material** to M&P's decision to merge with TTI, because M&P (and no reasonable business) would have moved forward with the merger with TTI without fuller disclosure about Richie's conflicts of interest while negotiating agreements for TTI.  Richie's omission on August 19, 2016, was maintained by staying silent on the kickback arrangement through TTI's merger with M&P 14 days later.

---

[51] Under New York law, to state a claim for fraud in the inducement, "a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Choquette v. Motor Information Systems, Inc.,* 15-CV-9338, NYLJ 1202794949574, at *1 (S.D.N.Y., August 2, 2017); *see also Orchid Constr. Corp. v. Gottbetter*, 89 A.D.3d 708 (N.Y. 2d Dept. 2011); *Northeast Steel Prods., Inc. v. John Little Designs, Inc.*, 80 A.D.3d 585 (N.Y. 2d Dept. 2011); *Hense v. Baxter*, 79 A.D.3d 814 (N.Y. 2d Dept. 2010).

162.   Richie **omitted the material fact** of his kickback arrangement with the **intention of inducing reliance** by the board of M&P and Plaintiffs, as imminent shareholders in TTI.

163.   Based on Richie's endorsement of the quality of George's work and their background going back almost over 10 years, M&P and Plaintiff Fan (as the imminent shareholders of TTI) acted in **reasonable reliance** on the representation to move forward with a merger with TTI on September 2, 2016.

164.   As a direct and proximate result of Defendants' fraudulent representations Plaintiffs were injured by its reliance on Defendant Hecker's representation.

165.   On behalf of the former shareholders of M&P, Plaintiffs seek rescission of the merger with TTI.

**Count 5: Unjust Enrichment (Delaware common law) (against Defendant Hecker)**

166.   Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

167.   Richie initially received 1,500,000 shares of TTI common stock.  Common Stock Purchase Agreement Exh. 40 [wC11].  Half of the shares vested immediately, and 1/36 of the remaining half vested each month.  Stock Restriction Agreement of Oct. 4, 2016 Exh. 42 [wC06] § 2(a).  The transfer of these shares caused a loss of TTI treasury stock from the corporation and a corresponding enrichment of Defendant Hecker.  The transfer was a direct result of Defendant Hecker's fraudulent inducement to merge M&P with TTI, as pleaded above, and lacks any justification.  Since the value of TTI's common stock is not determined at present, there is no remedy available at law for this enrichment, and the Plaintiffs are seeking restitution of any shares of TTI common stock, vested or unvested, owned by Defendant Hecker.

168.   This Court has equitable powers to provide restitution for Richie's unjust enrichment.[52]

---

[52] Delaware courts define unjust enrichment as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).  To state a claim, the complaint must allege sufficient facts plausibly to show: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law. *Id.* at 1130.

**Count 6: Interference with Prospective Economic Advantage (New York common law) (against Defendants Hecker, Traction & Scale LLC, Does 1–10)**

169.   Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

170.   New York common law provides a cause of action for tortious interference with a contractual relationship.[53]

171.   M&P **contracted** with the organizers of New York Techweek to enter its startup competition around October 15, 2015.  The competition offered advancing participants the opportunity to pitch their companies to potential investors and to meet with them one on one.

172.   Defendant Richie Hecker knew of M&P's participation in Techweek and **knew** or should have known that such a participant had contracted with Techweek. With **intent** to interfere with the contract, Richie asked his friend Defendant Doe 5, to breach the contract by "red flagging" M&P from reaching the final competition, effectively sequestering M&P from investors at Techweek.  This would allow Richie to approach M&P in hopes of locking up an exclusive deal with M&P. Richie then arranged a meeting with M&P and presented himself as a seasoned entrepreneur with a proven track record as a fundraiser and access to top technical talent.  As a result of the intentional interference, M&P lost the opportunity to meet with other potential investors at Techweek.  As multiple people over several businesses have recounted, *The day I met Richie was the worst day of my life.*

---

[53] Under New York Law, an action for interference with a contractual relationship is be based on five elements:
- A valid agreement between at least two parties;
- The interferer must have had knowledge of the agreement;
- The alleged interference must have caused the breach of contract;
- The interference must be intentional; and
- The interference caused the plaintiff to suffer damages.

173.   On information and belief, Plaintiffs allege that Defendant Does 1–3 continued their course of interference with TTI's business by directing the actions of Defendant Richie Hecker in his role as promoter, Chairman, and Director of TTI.

174.   On information and belief, Plaintiffs allege that Defendant Does 4 and 6–10 interfered with TTI's crowdfunding raise, resulting in a minimal amount raised compared to the amount that would ordinarily have been raised by a similar company at a similar stage of commercialization.

175.   As a direct and proximate result of the actions of Defendant Does 4 and 6–10 to induce Defendant Hecker's breach of his fiduciary duties, Plaintiffs have been damaged in an amount to be proven at trial.  In doing the acts alleged above, Richie acted with oppression, fraud, and malice, such that Plaintiffs are entitled to punitive damages.

## Count 7: Breach of Fiduciary Duties (Delaware common law) (Plaintiff Trustee of the Find Me Ink Trust against Defendant Hecker)

176.   Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

177.   Under Delaware (and New York) law, a **promoter** has a fiduciary duty to the investors of the corporation being formed, which continues after formation to the investors and shareholders of the corporation.

178.   Under Delaware law, a **director** of a corporation has a fiduciary duty to act in the best interests of the corporation and its shareholders[54]  Corporate officers and directors are not allowed to use their position of trust and confidence to further their private interests.  *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939).

### A.    $10,000 kickback arrangement for Defendant Hecker's personal gain

179.   Richie's arrangement of a $10,000 kickback, to come out of the $95,000 that TTI was to pay Jynglee under the Development Agreement, was a breach of his fiduciary duties to the corporation as a promoter and director.  The fact that Richie did not pocket the personal benefit as he hoped does not mitigate the breach because TTI was saddled with a developer for over 5 months that was unable to

---

[54] Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally. *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1, 36, 41-42 (Del. Ch. 2010). A corporate officer or director has the duty "not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest. *Ivanhoe Partners v. Newmont Mining Corp.,* 535 A.2d 1334, 1345 (Del. Supr. 1987).

1  meet any of the milestones under the Agreement.  In addition to the lost revenue,

2  wages, and overhead expenses, it also took time and energy away from the

3  directors of TTI to investigate Richie's fraudulent omission, all of which could

4  have been applied to building TTI's business.

5  180.   Despite portraying himself as an expert negotiator, he often seemed to take

6  the side of his friends and pressed TTI to accept less advantageous terms,[55] so that

7  in many deals, Richie had to be excluded from the final negotiations.  His divided

8  loyalties violated his fiduciary duties of **care** and **loyalty** to put the company's

9  interests above his own and his friends, which delayed and reduced the value of

10  each deal for the company.

11

12  **B.    Crowdfunding Drama**

13  181.   Richie's flip-flop of his desire to pursue crowdfunding and his unexplained

14  vote against it breached his fiduciary duty of candor to the TTI Board.

15  182.   On information and belief, Plaintiffs allege that Defendant Hecker acted and

16  conspired with his business associate Defendant Doe 4 or unknown Does 6–10 to

17  undermine TTI's crowdfunding campaign and to prevent the raising of funding that

18  would hinder **Richie's plans "to sell 100% of the company at this time"** to

19  **"multiple parties interested"**.  *See* Richie's email of Nov. 6, 2017, Exh. 54

20  [wH06].  Plaintiffs allege that Richie was motivated to do this in part to keep the

21  value of the company low for an easier acquisition or merger by Inked Magazine

22  or Bunker Hill Capital with whom he was negotiating with in private.  Instead of

23  shutting down the company, his new idea during his November 3, 2017 call, was to

24

25

26  [55] For example, Richie "negotiated" a proposed Revenue Loan Agreement with

27  Investor J at a usurious 300% rate of return.  If any payment was 5 days late, the
   entire balance would become due to Investor J.

28

sell TTI for a low price: "**It may not be much money, but at least we would get some money out of the deal and pay back investors**."

183.   This wasted the company's time and resources to support the Crowdfunder's on-boarding process, preparing marketing and pitch materials, due diligence, Form C submission, and campaign, hurting the value of the company and its shares of stock.

**C.    Richie's secret negotiations with competitors to sell TTI**

184.   The Board became aware of Richie's undisclosed contacts because they called or emailed TTI directly to confirm whether Richie was working on TTI's behalf, sometimes bringing up TTI's internal information that was not public. When asked about these contacts, Richie initially denied any involvement, but when prompted with specific information, his recollection became hazy about whom he had talked to over time.

185.   Plaintiffs allege a reasonable Director, when presented with information that competitors had been contacted by someone who purported to be the Director with nonpublic corporate information, would want to investigate and get to the bottom of the contacts under a general duty of care.  This would particularly true if the allegation involved his family friend and mentor Doe 1, who played a pivotal role during the formation of TTI and early investor.

186.   On November 3, 2017, *Investor D* called TTI and volunteered that he had been in touch with Richie several times over the past year about acquiring TTI, and was aware of nonpublic information about a new partnership TTI had recently formed.

187.   On Nov. 5, 2017, he admitted to also talking to *Investor C* a few weeks before.

188.   Richie's machinations to negotiate a strategic deal within the tattoo industry may have been valuable and consistent with his fiduciary duties to the company that he was a Chairman and Director of, *had he been open with the rest of the TTI Board about his back-door dealings to sell the company*.  Instead, he did this in secret and denied the contacts, admitting them reluctantly after being given evidence of the contacts from the contacts themselves.  TTI's Board was unable to make Richie understand that these contacts were inappropriate without disclosure to the Board.

189.   Plaintiffs propose that if Richie wanted the freedom to act as a broker to negotiate deals with other companies in the industry to effect an acquisition of TTI, he knew he had legal options, including (1) disclosing his contacts to the TTI Board (per Richie Rule 1), (2) resigning as Chairman and Director and working for TTI as an independent dealmaker or "Finder", and/or (3) registering as a broker.

## D.   Termination Drama

190.   The fiduciary duty of directors continues as long as he is a director, and ends with resignation or termination.[56]  Richie's fiduciary duty as a director precluded him from seeking the best possible exit package for himself while he was being terminated.

191.   Instead, Richie proposed a series of exit proposals, *e.g.,* on September 6, 2017 (Exh. 51 [wH10], Exh. 52 [wH09]), September 11th (Exh. 53 [wH08]), November 3rd, November 6th (Exh. 54 [wH06])[57] for his personal benefit and that

---

[56] *See Petroleum Enhancer, LLC v. Woodward* 690 F.3d 757 (6th Cir. 2012) ("the general rule—that directors owe a fiduciary duty to their corporation until they resign, their term ends, or they are officially removed from their position—does not place an onerous burden on directors who prefer to be unencumbered by fiduciary obligations.  The message to such directors is simple: resign").

[57] "**Attached is a copy of my resignation letter**."  Richie was prompted to sign his own resignation letter in advance "to save time".  "**At your request, I have sent**

of his investor friends.[58]  Some of these proposals would earmark 20–100% of any investment from new investors to pay off Richie and the earlier investors.

**E.     Remedy**

192.   Plaintiffs have no adequate legal remedy for these breaches of fiduciary duties in that damages are inadequate to remedy the harm to the director-company relationship.  As a result, Plaintiffs are entitled to equitable relief in the form of injunctive relief and full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that Richie may have been obtained as a result of such actions, including the imposition of a constructive trust over the proceeds of such actions.  In doing the acts alleged above, Richie acted with oppression, fraud, and malice, such that Plaintiffs are entitled to punitive damages.

---

**this back signed."**  To be fair, Richie did condition the resignation until outside counsel approved the letter, etc.

[58] Richie's attorney wrote that "the buyout option [for Richie] definitely seems like it **shouldn't be an issue with investors** Richie introduces in [that] **they're already aware of how their money is being used**." Exh. 53 [wH08].  This shows that Richie had "already" been talking to his investor friends about his exit strategies, which would inevitably breach the confidentiality provisions of the IPAA because *he had not disclosed any of this to the TTI Board.*

**Count 8: Inducing Breach of Fiduciary Duties (Delaware common law)**

**(Plaintiff Trustee of the Find Me Ink Trust against Defendant Does 1–3 & 5)**

193.   Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

194.   As a promoter and director of TTI, Defendant Richie Hecker owed a fiduciary duty to the corporation and its shareholders to avoid self dealing and to hold their interests above his own personal gain.  Richie may from time to time defend that his exposure is limited[59] as a director of the corporation.  Should such limitations exist, it does not extend to his co-conspirators who are not directors.

195.   Defendant Hecker presented himself as a promoter and as the Chairman of TTI.  On information and belief, Plaintiffs allege that Defendant Does 1–3 & 5 were sophisticated investors and fund managers or professionally managed funds who knew or should have known of Defendant Hecker's **fiduciary duties** to TTI.

196.   Plaintiffs are informed and believe, and on that basis allege, that in connection with Defendant Hecker's role with TTI, Defendant Does 1–3 & 5 **intended** to cause, and in fact caused, Defendant Hecker to breach his fiduciary duties by encouraging him to contact other tattoo companies *in secret* to negotiate a sale of TTI for not much money.

197.   Plaintiffs are informed and believe, and on that basis allege, that Defendant Does 1–3 & 5 **knew** their actions would **induce** a breach of Defendant Hecker's fiduciary duties, because in practical terms, it would have been impossible for Defendant Hecker to negotiate to sell TTI *in secret* without breaching his fiduciary duties to TTI.

---

[59] *See, e.g.,* Certificate of Incorporation, Art. IX. A. at 2, Exh. 39 [wC07]; Indemnification Agreement, Exh. 37 [wC22].  *But* to indemnify a director against breaking SEC law and committing fraud on shareholders would surely be against public policy.

198.   As a direct and proximate **result** of the actions of Defendant Does 1–3 & 5 to induce Defendant Hecker's breach of his fiduciary duties, Plaintiffs have been **damaged** in an amount to be proven at trial.  In doing the acts alleged above, Defendant Does 1–3 & 5 acted with oppression, fraud, and malice, such that Plaintiffs are entitled to punitive damages.

**Count 9: Breach of Intellectual Property Assignment Agreement (Delaware common law) (against Defendant Hecker)**

199.   Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

200.   Defendant Richie Hecker (designated "Assignor") entered into a **valid and binding** Intellectual Property Assignment Agreement (IPAA) with Tattoo Technologies, Inc. (designated "Company") on August 23, 2016.  Exh. 41 [wG05]. The IIPAA contains the following nondisclosure provision:

> 3.   Confidential Information. Assignor will not use or disclose anything assigned to the Company hereunder or any other technical or business information or plans of the Company, except in accordance with the terms of any employment or service agreement with the Company or to the extent Assignor can document that it is generally available (through no fault of Assignor) for use and disclosure by the general public without any charge, license or restriction. Assignor recognizes and agrees that there is no adequate remedy at law for a breach of this Section 3, that such a breach would irreparably harm the Company and that the Company is entitled to equitable relief (including, without limitation, injunctive relief) with respect to any such breach or potential breach in addition to any other remedies and without any requirement to post bond.

201.   From August 23, 2016 to at least November 2017, Richie shared the confidential and nonpublic information of TTI with Defendant Doe 1.  Richie did so without TTI's consent,[60] and in connection with his role as Chairman and member of the Board of directors of TTI.

---

1.   [60] In short, having the title of Chairman or Director does not mean Richie gets to go off on his own and make his own deals in secret without telling the other Directors (per Richie Rule 1).

202.   Around July 12, 2017, Richie texted TTI's CEO that he had been speaking with a founder of inkHunter, another technology company in the tattoo industry. Exh. 47 [wG01].  The CEO asked "How MUCH information did you leak about our company and what we are missing?"  In keeping with his habit of not answering direct questions, Richie responded only "Sponsors like brands / advertising not industry sponsors.  Separately, I also got more info on fake app installs."  *Id.*

203.   As a result of the Defendant Hecker's breach of the IIPA, Plaintiffs are entitled to a restraining order, preliminary and permanent injunctive relief, attorneys' fees and costs, and damages.  In doing the acts alleged above, Richie acted with oppression, fraud, and malice, such that Plaintiffs are entitled to punitive damages.

**Count 10: Inducing Breach of Intellectual Property Assignment Agreement**

**(Delaware common law) (against Defendant Does 1–3)**

204.   Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

205.   Defendant Richie Hecker (designated "Assignor") entered into a **valid and binding** Intellectual Property Assignment Agreement (IPAA) with Tattoo Technologies, Inc. (designated "Company") on August 23, 2016 to protect TTI's confidential information, including business strategy and market information.  Exh. 41 [wG05].

206.   Plaintiffs are informed and believe, and on that basis allege, that in connection with Defendant Hecker's role with TTI, Defendant Does 1–3 **intended** to cause, and in fact caused, Defendant Hecker to **breach** the IPAA by encouraging him to contact other companies in the tattoo industry to negotiate the sale of TTI, and in doing so, share TTI's confidential business strategy and market information.

207.   Doe 1, a sophisticated and professional fund manager, received confidential information over time that he **knew** or should have known was nonpublic and protected by nondisclosure agreements.  He also knew or should have known that he was aiding and abetting the breach of basic confidentiality agreements that are in place between companies and their personnel.

208.   On November 3, 2017, when Richie was asked whether Defendant Doe 1 had asked him to contact inkHunter, he asked "The second time?"  "*Any* time."  Richie: "I don't recall".  Plaintiffs allege that the expected answer for a reasonable Chairman of a company exercising a duty of care and candor would not have any trouble recalling whether his friend and mentor had directed him to contact a competitior in secret about a potential sale of the company at a bargain price.

209.   On November 5, 2017, Richie suggested that Doe 1 may have already independently spoken to a few people who were potential acquisition partners.

210.   Plaintiffs are informed and believe, and on that basis allege, that Defendant Does 2 and 3 were fund managers or professionally managed funds that knew or should have known their actions would **induce** a breach of a nondisclosure agreement, because in practical terms, it would have been impossible for Defendant Hecker to negotiate the sale of TTI with other tattoo companies without disclosing nonpublic business strategy and market information.

211.   As a direct and proximate **result** of the actions of Defendant Does 1–3 to induce Defendant Hecker's breach of the IPAA, Plaintiffs have been **damaged** in an amount to be proven at trial.

**Count 11: Breach of Reciprocal Nondisclosure Agreement (New York common law) (against Defendant Traction & Scale LLC and Hecker)**

212.   Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

213.   Defendant Traction & Scale LLP (T&S) entered into a **valid and binding** Reciprocal Nondisclosure Agreement (RNA) with Mahoney & Partners Financial Services, Inc. (M&P) on April 10, 2016.  Exh. 29 [wG04].

214.   The RNA protects the confidential and proprietary information of M&P, including industry research data from its marketing campaigns.  The confidential information was to be protected "until such time as all Confidential Information of the other party disclosed hereunder becomes publicly known and made generally available through no action or inaction of the receiving party." *Id.* § 9.  That time has not yet occurred.

215.   On information and belief, Plaintiffs allege that Defendant Traction & Scale LLC, acting through Defendant Richie Hecker, breached this agreement by disclosing confidential business information, including M&P's marketing data to **inkHunter** on or prior to July 12, 2017.  Around July 12, 2017, Richie emailed TTI's CEO that he had been speaking with a founder of inkHunter, another technology company in the tattoo industry.  Exh. 47 [wG01].  The CEO asked "How MUCH information did you leak about our company and what we are missing?"  In keeping with his habit of not answering direct questions, Richie responded "Sponsors like brands / advertising not industry sponsors.  Separately, I also got more info on fake app installs." *Id.*

216.   On information and belief, Plaintiffs allege that Defendant Traction & Scale LLC, acting through Defendant Richie Hecker, breached this agreement by disclosing M&P's confidential business information to personnel at Bunker Hill Capital or Nexus Brands Group.

217.   On information and belief, Plaintiffs allege that Defendant Traction & Scale LLC, acting through Defendant Richie Hecker, breached this agreement by disclosing M&P's confidential business information to Donald Hellinger or other persons at Quadra Media, LLC, dba Inked Magazine.  Mr. Hellinger contacted TTI's CEO to confirm whether or not Richie was working on TTI's behalf**.**

218.   Richie made these disclosures so without TTI's consent and without telling the other members of the Board, while maintaining his position as Chairman and Chief Catalyst of Traction & Scale LLC.

219.   As a direct and proximate of the Defendants' breach of the RNA, Plaintiffs have been damaged in an amount to be proven at trial.

220.   These unauthorized and secret communications with potential business partners, who are remain potential competitors, damaged the Board's ability to conduct coherent business development and undermined TTI's negotiation position and perceived value in the industry, damaging TTI's shareholder value.  They also required the diversion of corporate resources to investigate and document, which represented time and effort that could have been applied toward building the business and the value of the corporation for the shareholders and other investors, such as the holders of stock options and SAFE investors.

221.   As a result of Defendants' action, the Find Me Ink Trust and similarly situated investors of TTI have been harmed as shareholders of the company.  As a result of the Defendants' breach of the RNA, Plaintiffs are entitled to a restraining order, preliminary and permanent injunctive relief, attorneys' fees and costs, and damages.  In doing the acts alleged above, Richie acted with oppression, fraud, and malice, such that Plaintiffs are entitled to punitive damages.

**Count 12: Inducing Breach of Reciprocal Nondisclosure Agreement (New York common law) (against Defendant Does 1–3)**

222.   Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

223.   Defendant Traction & Scale LLP (T&S) entered into a **valid and binding** Reciprocal Nondisclosure Agreement (RNA) with Mahoney & Partners Financial Services, Inc. (M&P) on April 10, 2016 to protect TTI's confidential information, including business strategy and market information.  Exh. 29 [wG04].

224.   Plaintiffs are informed and believe, and on that basis allege, that in connection with Defendant Hecker's role with TTI, Defendant Does 1–3 **intended** to cause, and in fact caused, Defendant Hecker to **breach** the RNA by encouraging him to contact other companies in the tattoo industry to negotiate the sale of TTI, and in doing so, share TTI's confidential business strategy and market information.

225.   Doe 1, a sophisticated and professional fund manager, received confidential information over time that he **knew** or should have known was nonpublic and protected by nondisclosure agreements.  He also knew or should have known that he was aiding and abetting the breach of basic confidentiality agreements that are in place between companies and their personnel.

226.   On November 3, 2017, when Richie was asked whether Defendant Doe 1 had asked him to contact inkHunter, he asked "The second time?"  "*Any* time."  Richie: "I don't recall".  Plaintiffs allege that the expected answer for a reasonable Chairman of a company exercising a duty of care and candor would not have any trouble recalling whether his friend and mentor had directed him to contact a competitior in secret about a potential sale of the company at a bargain price.

227.   On November 5, 2017, Richie suggested that Doe 1 may have already independently spoken to a few people who were potential acquisition partners.

228.   Plaintiffs are informed and believe, and on that basis allege, that Defendant Does 2 and 3 were fund managers or professionally managed funds that knew or should have known their actions would **induce** a breach of a nondisclosure agreement, because in practical terms, it would have been impossible for Defendant Hecker to negotiate the sale of TTI with other tattoo companies without disclosing nonpublic business strategy and market information.

229.   As a direct and proximate **result** of the actions of Defendant Does 1–3 to induce Defendant Hecker's breach of the RNA, Plaintiffs have been **damaged** in an amount to be proven at trial.

**Count 13: Civil Conspiracy (New York common law) (against all Defendants)**

230.   Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

231.   Since October 2015, Defendant Doe 1 has directed Defendant Hecker's actions and the two have acted in concert without the consent and informing the Board of TTI.  During this time, Defendant Hecker disclosed the confidential information of M&P and TTI to Doe 1 regularly with reckless disregard for its confidential nature.  Defendant Doe 1 manages or is the employee of Does 2 and 3 and works at their direction.

232.   Plaintiffs are informed and believe, and on that basis allege, that two or more of the Defendants agreed to a common plan to, among other things, negotiate the sale of TTI in secret from the other Directors of TTI, and to commit the other tortious conduct described in this Complaint

233.   In furtherance of the conspiracy, Defendants Hecker and Doe 1 fraudulently concealed from Plaintiffs material facts regarding his actions that were introduced to deceive and defraud Plaintiffs.

234.   Plaintiffs are informed and believes and thereon alleges that the last overt act in pursuance of the above-described conspiracy occurred on or about the date of filing of the Complaint.

235.   On information and belief, Plaintiffs allege that the Defendants had actual knowledge that such tortious conduct would occur and concurred in the scheme with knowledge of its unlawful purpose.

236.   On information and belief, Plaintiffs allege that in agreeing to commit such tortious conduct against Plaintiffs, the Defendants acted for their own individual advantage and personal gain.

237.   As a direct and proximate result of the actions of Defendants' conspiracy to commit such tortious conduct, Plaintiffs have suffered substantial damages and is entitled to the relief sought herein.

238.   The Defendants' conspiracy to commit tortious conduct against Plaintiffs renders each of them liable for all acts taken by their co-conspirators before and after each Defendant joined the conspiracy.

## Count 14: Aiding and Abetting (New York common law) (against all Defendants)

239.   Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

240.   Defendant Hecker resides in New York state, and Defendants T&S and HC have principal places of business in New York.  Defendant Does 1–5 also reside or have a principal place of business or have a substantial presence in New York. New York allows a cause of action for aiding and abetting a breach of fiduciary duty[61] and the other wrongs committed by Defendant Hecker.

241.   Plaintiffs are informed and believe, and on that basis allege, that Defendant Does 1–5 **knew** Defendant Hecker's actions alleged above would constitute a breach of fiduciary duties[62] and the other wrongs described above.  For example, it would not be practically possible for Defendant Does 1–3 to be unaware of

---

[61] To succeed on a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must make "a prima facie showing of a fiduciary duty owed to plaintiff, . . . a breach of that duty, and defendant's substantial assistance . . . in effecting the breach, together with resulting damages." *Ito v. Suzuki*, 2008 WL 5057264, at *2 (1st Dept. 2008).

[62] Victims of fraud and breaches of fiduciary duty often have the right to bring claims against those who aid and abet the fraud or breach. While only the Securities and Exchange Commission (not private litigants) may bring an action for aiding and abetting federal securities fraud, victims can make use of New York state causes of action to seek recovery from those who help the primary damage-causing party.  For claims of fraud, an aider and abetter can be held liable for the primary party's fraud if the helper had knowledge of the fraud and provided substantial assistance in carrying out the fraudulent scheme. Likewise, an aider and abetter can be held liable for the primary party's breach of fiduciary duty if he or she had knowledge of the duty and either substantially assisted or procured the breach.  Claims of aiding and abetting are useful where the primary actor cannot pay a judgment (as will usually be the case when a Ponzi scheme implodes)  https://www.fordobrien.com/Commercial-Litigation/Aiding-And-Abetting-Claims.shtml

Richie's position as Promoter and Director while directing his actions.  Defendant Doe 4's LinkedIn page showed his connection with Crypto Working Group, and a single click on his co-founder Richie's page would have revealed Richie was Chairman of TTI.  Also, Defendant Doe 5, who had reviewed a tattoo-oriented website with Richie earlier, was aware of his connection with M&P and interest in promoting a tattoo-oriented corporation because he intervened in the Techweek competition on Richie's request.

242.   Plaintiffs are informed and believe, and on that basis allege, that Defendants gave **substantial assistance** and encouragement to Defendant Hecker to breach his fiduciary duties and to unlawfully carry out the other wrongs described above.

243.   Plaintiffs are informed and believe, and on that basis allege, that Defendants' assistance and encouragement was a substantial factor causing harm to Plaintiffs.

244.   By such conduct, Defendant Does 1–5 aided and abetted Defendant Hecker in breaching his fiduciary duties to TTI, and committing the other wrongs described herein.  Defendant Does 1–5 are therefore jointly responsible for Defendant Hecker's conduct.

**Count 15: Request for Declaratory Judgment of Alter Ego (Delaware common law) (Defendants Traction & Scale LLC and Hecker)**

245.   Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

246.   Over the years, Defendant Richie Hecker has used the address of his father's dentistry practice at 2160 81st Street, Brooklyn, New York 11214 as his business address for all of his business correspondence.

247.   Defendant Richie Hecker formed Defendant **Traction & Scale LLC** (T&S) as a Delaware limited liability company (file number 4966642) on April 8, 2011, having a principal place of business at 2160 81st Street, Brooklyn, New York 11214.  Richie described T&S "as an entity which is owned by me."  Call of April 5, 2016.  He uses the titles of Chairman and "Chief Catalyst".

248.   Except for a brief time, since October 2015, Richie has used his richie@tractionandscale.com email address exclusively for all of his correspondence with Plaintiffs and potential investors, signing as "Chairman & Chief Executive Officer" in the signature box. Plaintiffs allege that Defendant Hecker completely controlled Defendant Traction & Scale LLC.

249.   Plaintiffs claim that Traction & Scale LLC was a mere instrument or tool of Defendant Richie Hecker.  Plaintiffs claim that Defendant Richie Hecker and T&S are in essence one and the same, so that it is possible to disregard the separate corporate existence of T&S and hold T&S responsible for Defendant Hecker's acts and obligations.

250.   "Delaware law permits a court to pierce the corporate veil where there is fraud or where [the corporation] is in fact a mere instrumentality or alter ego of its owner" *Soroof Trading Dev. Co. Ltd. v. GE Fuel Cell Systems LLC*, 2012 WL 209110 at 27 (S.D.N.Y. Jan. 24, 2012) (quoting *NetJets Aviation, Inc. v. LHC Comms. LLC,* 537 F.3d 168, 177 (2d Cir. 2008)) (finding LLC to be alter ego and

granting S.J. to pierce the veil of Del. LLC).  "To prevail under the alter-ego theory of piercing the veil, a plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an overall element of injustice or unfairness." *Id.*  Alter ego factors to be considered include capitalization, solvency, payment of dividends, adequate records, functioning officers and directors, other LLC[63] formalities, siphoning funds off, and the entity functioning as a "façade" for the owner.  *Id.*

251.   As alleged above, Defendant Richie Hecker has already admitted he fraudulently omitted the material fact of his kickback arrangement while and after entering the Development Agreement with Jynglee and when inducing M&P to merge with TTI.

252.   On information and belief, Plaintiffs allege: (1) Defendant Hecker created Defendant Traction & Scale LLC for the sole purpose of shielding the assets of one another; Defendants failed to maintain LLC books and records, its single member Defendant Hecker failed to conducted regular meetings and other LLC formalities; (4) the funds of Defendants Hecker and Traction & Scale LLC were intermingled in the same accounts, where Richie siphoned LLC funds for personal use.

253.   On information and belief, Plaintiffs allege that Defendant Hecker's control and the wrongful use of that control of Defendant Traction & Scale LLC are a proximate or direct cause of Plaintiffs' loss.

254.   An actual controversy has arisen and now exists between Plaintiffs and Named Defendants concerning their respective rights and duties, in that Plaintiffs

---

[63] "These principles are generally applicable as well where one of the entities in question is an LLC rather than a corporation," except that "somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required." *Id.* (quoting *NetJets Aviation* at 178); *see also* Delaware Limited Liability Company Act, 6 DEL. CODE ANN. § 18-101 *et seq.*

contend Defendant Traction & Scale LLC is merely an alter ego of Defendant Hecker.

255.   Plaintiffs desire a judicial determination of Plaintiff's rights and duties, and a declaration that either or both of Defendant Traction & Scale LLC is an alter ego of Defendant Hecker.  A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiffs may ascertain their rights under any judgment or relief by this Court.  A full and complete judgment against Defendant Hecker individually may be inadequate for relief of Plaintiffs' claims, and holding Defendant Traction & Scale LLC accountable is necessary to avoid "injustice or unfairness".

256.   Plaintiffs request that this Court determine the relationship between Defendants Hecker and Traction & Scale LLC for the purpose of post-judgment collections.

257.   The interests of Defendants Hecker and Traction & Scale LLC are adverse as a determination that one is the alter ego of the other and would allow Plaintiffs to execute against the assets of that entity.

258.   Plaintiffs allege that there is sufficient immediacy between Defendants Richard Hecker and Traction & Scale LLC that either could liquidate or transfer its assets at any time.

**Count 16: Request for Declaratory Judgment of Alter Ego (New York common law) (against Defendants Hecker Consultancy, LLC and Hecker)**

259. Plaintiffs incorporate by reference the paragraphs above as if set forth here at length.

260. Over the years, Defendant Richie Hecker has used the address of his father's dentistry practice at 2160 81st Street, Brooklyn, New York 11214 as his business address for all of his business correspondence.

261. Defendant Richie Hecker formed **Hecker Consultancy, LLC** (HC) on July 21, 2004, as a New York limited liability company (DOS ID 3081162), having a mailing address at 2160 81st Street, Brooklyn, New York 11214. Richie is the sole owner and the Managing Member.[64] While Hecker Consultancy has not appeared in many recent incidents involving Richie, on September 11, 2017, he did not object to its inclusion among parties to be bound by proposed settlements along with Defendant Hecker individually and with Defendant Traction & Scale LLC. Plaintiffs allege that Defendant Hecker completely controlled Defendant Traction & Scale LLC.

262. Plaintiffs claim that Hecker Consultancy, LLC was a mere instruments or tools of Defendant Richie Hecker. Plaintiffs claim that Defendant Richie and HC are in essence one and the same, so that it is possible to disregard the separate corporate existence of HC and hold HC responsible for Defendant Hecker's acts and obligations.

263. In New York, a defendant faces loss of the LLC shield where Plaintiffs can prove that: (1) Defendant Hecker exercised complete domination of Hecker Consultancy, LLC in respect to the transactions attacked, and (2) that such

---

[64] "I, Richard Hecker, am the 100% owner of Hecker Consultancy." Declaration of Richard Hecker in Supp. Mot. Appoint. of Receiver for Bebo, Inc. (Jan. 1, 2013) ¶ 1.

domination was used to commit a fraud or wrong against Plaintiffs, which resulted in Plaintiffs' injury. *See Superior Transcribing Serv. LLC v. Paul*, 72 A.D.3d 675, 676, 898 N.Y.S. 2d 234, 235 (2d Dep't 2010).

264.   On information and belief, Plaintiffs allege: (1) Defendants Hecker created Defendant Hecker Consultancy LLC for the sole purpose of shielding the assets of one another; Defendants failed to maintain LLC books and records, its single member Defendant Hecker failed to conducted regular meetings and other LLC formalities; (4) the funds of Defendants Hecker and Hecker Consultancy LLC were intermingled in the same accounts, where Richie used LLC funds for personal use.

265.   On information and belief, Plaintiffs allege that as the 100% owner of Hecker Consultancy, LLC, his complete control and the wrongful use of that control are a proximate or direct cause of Plaintiff's loss.

266.   An actual controversy has arisen and now exists between Plaintiffs and Named Defendants concerning their respective rights and duties, in that Plaintiffs contend that Defendant Hecker Consultancy LLC is merely an alter ego of Defendant Hecker.

267.   Plaintiffs desire a judicial determination of Plaintiffs' rights and duties, and a declaration that Defendant Hecker Consultancy LLC is an alter ego of Defendant Hecker.  A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiffs may ascertain their rights under any judgment or relief by this Court.  A full and complete judgment against Defendant Hecker individually may be inadequate for relief of Plaintiffs' claims, and holding Defendant Hecker Consultancy accountable is necessary to effectuate justice.

268.   Plaintiffs request that this Court determine the relationship between Defendants Richard Hecker and Hecker Consultancy, LLC for the purpose of post-judgment collections.

269.   The interests of Defendants Richard Hecker and Hecker Consultancy, LLC are adverse as a determination that one is the alter ego of the other and would allow Plaintiffs to execute against the assets of that entity.

270.   Plaintiffs allege that there is sufficient immediacy between Defendants Richard Hecker and Hecker Consultancy, LLC that either could liquidate or transfer its assets at any time.

## V.  Prayer for Relief

Wherefore, Plaintiffs demand judgment against the Defendants jointly, severally, or individually as follows:

1.   Compensatory damages (consisting of general and special damages) in an amount to be proven at trial, but at least Defendant Hecker's own valuation of TTI of $3.5 million, together with interest as allowed by law;

2.   Punitive damages;

3.   Reasonable attorneys' fees and costs of suit;

4.   Costs incurred herein; and

5.   Injunctive Relief, including

    (a)   Restitution of the approximately 770,833 shares of TTI common **stock** owned by Defendant Hecker;

    (b)   Rescission of the Website and Mobile Applications **Development Agreement** of August 19, 2016 Exh. 30 [wD01], to the extent any of its provisions survived cancellation on January 18, 2017 Exh. 50 [wD07];

    (c)   Rescission of the Agreement and Plan of **Merger** of Sept. 2, 2016 Exh. 49 [wC01];

    (d)   Rescission of the $25,000 **SAFE** between TTI and Jynglee of November 13, 2016 Exh. 46 [wD05];

(e)    a Preliminary Injunction to prevent Defendant Hecker from any **further disclosure** of TTI's confidential information; and

(f)    a Permanent Injunction that Defendant Richard Hecker cease further solicitation and negotiation of transactions in securities until such time as he be a registered **broker**-dealer by the Securities & Exchange Commission.

6.    A declaration that either or both of Defendant Traction & Scale LLC and Hecker Consultancy, LLC are **alter egos** of Defendant Richard Hecker.

7.    Such other and further relief as this Court may seem just and proper.

## VI. Jury Demand

Plaintiffs hereby demand a trial of their claims against all Defendants by jury.

Dated this ⎯17⎯ th day of May 2018.

_____
Calvin Fan
Trustee for the Find Me Ink Trust

## Certificate of Service

I hereby certify that on May ⎯17⎯ , 2018, I will electronically file the foregoing Complaint with the Clerk of the Court using the CM/ECF system. Within 90 days thereafter, I will serve a paper copy of the Complaint (with the exhibits on a USB drive) on Defendants Richard Hecker, Traction & Scale LLC, and Hecker Consultancy at their regular business address at 2160 81st Street, Brooklyn, New York 11214.

_____
Calvin Fan

**Exhibits to Complaint: Table of Contents**

1.   Decl. of Richard Hecker in Supp. Mot. Appoint. Receiver for Bebo, Inc. of Jan. 1, 2013 in *MXB Holdings v. Levin* [TTI internal reference wA01]

2.   2012-12-31 10k (Ascend), selected [wA20]

3.   2015-01-23 Blog | Mojiva – the mobile ad network [wA15]

4.   VC TaskForce event [wA39]

5.   Better Know a Young Millionaire [wA02]

6.   Safeguard marriage ins [wA25]

7.   RichieHecker, about (2008) [wA10]

8.   Spolar v. Hecker complaint [wA21]

9.   richie.hecker, speaker [wA29]

10.   Seeking Alpha bio [wA27]

11.   I bought Bebo [wA22]

12.   2015-10-17 Richie Hecker (LinkedIn) [wA08]

13.   2013-02-29 Richie & Ascend consulting agt [wA34]

14.   2013-06-12 Kitara merger, ouster [wA35]

15.   PubMatic Acquires Mobile Ad Server Mocean (AdAge) [wA28]

16.   Tech Company/ We Will Put Up $10 Million [wA14]

17.   Trump stunt comments [wA30]

18.   2017-05-04 Bi-Partisan Health Care System [wA17]

19.   2018-05-12 Richie Hecker | LinkedIn [wA31]

20.   2018-03-30 Team — Traction & Scale [wA32]

21.   Team Hinter [wA03]

22.   Crypto Working Group [wE02]

23.   2016-04-25 Term Sheet (NewCo) [wC18 ]

24.   2016-07-14 (rh) apologies [wB05]

25.   2016-03-02 (rh) Re Topics for call [wD08]

26.   2016-07-24 (rh) Thinking [wD09]

27.   Action Mike [wD10]

28.   2016-01-24 Why Tech Entrepreneurs Should Support Bloomberg [wA26]

29.   2016-04-10 Reciprocal Nondisclosure Agt (RNA) (T&S-FMI) [wG04]

30.   2016-08-19 Jynglee-TTI agreement [wD01]

31.   2016-08-18 HOT GeorgeFMI Deal Terms [wD03]

32.   2016-08-18 (cf) Version 20160818c [wD16]

33.   2016-08-19 a0905 (cf-) Agreement for your signature [wD13]

34.   2016-08-19 a1126 (gs-rh) Agreement for your signature [wD02]

35.   2016-08-19 (rh-cf) Agreement for your signature [wD04]

36.   2016-12-21 (cf) Notice to Board [wD17]

37.   2016-08-23 Indemnification Agt (Hecker) [wC22]

38.   2016-07-11 Engagement Letter - Tattoo Technologies IncSigned [wC19]

39.   2016-07-28 Certificate of Incorporation, filed (TTI) [wC07]

40.   2016-08-24a Common Stock Purchase Agreement (TTI-Hecker) [wC10]

41.   2016-08-23 IP Assignment (Hecker) [wG05]

42.   2016-10-04 Stock Restriction (TTI-Richie) [wC06]

43.   2017-04-21 (rh) C Corp email [wE05]

44.   2016-10-04 Stock Restriction (TTI-Fan) [wC12]

45.   2018-04-18 Demand to TTI Board (FMIT) [wI01]

46.   2016-11-13 SAFE (TTI-Jynglee) signed [wD05]

47.   2017-07-12 (mm) Ink Hunter Notes Confidential [wG01]

48.   2016-07-13 (rh) projections [wC21]

49.   2016-09-02 FMI Agt & Plan of Merger [wC01]

50.   2017-01-18 cancellation notice (TTI-Jynglee) [wD07]

51.   2017-09-06 Richie call (Jack in the Box) [wH10

52.   2017-09-06a Proposed Transition Plan [wH09]

53.   2017-09-11 termination (Richie-TTI) [wH01]

54.   2017-09-11a Draft resignation letter for your review [wH08]

55.   2017-11-06b Richie's Resignation Letter [wH06]

56.   2017-11-10 Richie termination T3 [wH11]